# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### April 16, 2013 Session

## JONATHAN TEARS v. STATE OF TENNESSEE

**Appeal from the Circuit Court for Marshall County**
**No. 11-CR-76    Robert Crigler, Judge**

---

**No. M2012-01080-CCA-R3-PC - Filed December 6, 2013**

---

Petitioner, Jonathan Tears, appeals from the trial court's denial of his petition for post-conviction relief following an evidentiary hearing. On appeal, Petitioner contends that the trial court erred in denying the petition because the State violated his constitutional rights by withholding material exculpatory information, and trial counsel rendered ineffective assistance of counsel. More specifically, Petitioner contends that the State (1) failed to disclose a statement made by the victim; (2) failed to disclose the statement of Ashton Davis; (3) failed to disclose the statement of Felice O'Neal; (4) failed to disclose the statement of Tangelia Alexander; and (5) failed to disclose payment from the Criminal Injuries Compensation Fund. Petitioner argues that trial counsel rendered ineffective assistance of counsel by (1) failing to "investigate, interview, subpoena, and call to the stand" Shelby Harris, Darron Little, Alexander Harris, Jarrod Robinson, Zeldra Swaggerty, and Adriana Cross; (2) failing to request Jenck's material and cross-examine the victim concerning his statement to Detective Oliver; (3) failing to request a ballistics expert to testify at trial; and (4) failing to investigate and assert the defense of self-defense. Petitioner also argues that trial counsel was ineffective on direct appeal for failing to raise *Brady* issues. Following our review of the record, we reverse the judgment of the trial court denying post-conviction relief and remand this cause for a new trial.

**Tenn. R. App. P. 3 Appeal as of Right;**
**Judgment of the Circuit Court Reversed and Remanded for a New Trial**

THOMAS T. WOODALL, J., delivered the opinion of the court, in which JAMES CURWOOD WITT, Jr. and ROBERT W. WEDEMEYER, JJ., joined.

Robert Dalton, Lewisburg, Tennessee, for the appellant, Jonathan Tears.

Robert E. Cooper, Jr., Attorney General and Reporter; Clark B. Thornton, Assistant Attorney General; Robert Carter, District Attorney General; and Weakley E. Barnard, Assistant District Attorney General, for the appellee, the State of Tennessee.

## OPINION

### I. Background

Following a jury trial, and after the trial court's mergers of guilty verdicts, Petitioner was ultimately convicted of attempted second degree murder and employment of a firearm during the commission of a felony. The facts underlying Petitioner's convictions as recited by this court on direct appeal are as follows, wherein Petitioner is referred to as "the Defendant:"

> Gary DeJuan O'Neal, the victim, testified that the Defendant dated his cousin, Danielle O'Neal and that the Defendant and Ms. O'Neal had two children together. A few weeks before the altercation, the Defendant and the victim argued. The victim testified that on the night of May 10, 2008, he drank two or three 12ounce beers before arriving at the Soul Train Bar and Grill in Lewisburg, Tennessee with his girlfriend, Tikeya Johnson. Once he arrived at the bar, he drank two mixed drinks of "gin and juice." He consumed these drinks within 10 or 15 minutes. At approximately midnight, the victim went outside, where he saw the Defendant. The victim walked up to the Defendant and said, "[We need to] stay away from each other because I don't like you and you don't like me." In response, the Defendant "pushed" or "mugged" the victim's head, and the two started fighting. When the victim, who was winning the fight, stepped back, the Defendant retrieved a "semi-automatic pistol-type weapon" from his waistband area and "loaded a bullet into the chamber." The Defendant then looked at the victim and shot him one time in the neck before running away. The victim walked toward Ms. Johnson but "slightly stumbled" before Ms. Johnson and Ashton Davis were able to help him to his car. Ms. Johnson drove him to the hospital.

> The victim testified that when he arrived at the hospital, he was in "excruciating pain" until he was given medication. He said that the pain medication did not relieve all of his pain and that he stayed in the hospital for 13 days. The victim testified that his pain did not fully go away until a month or two later. The victim stated that the bullet collapsed his lung and that doctors had to "repump" his lung. He stated that he was unable to eat solid foods because of the pain resulting from the collapsed lung.

Ms. Johnson testified that she drank a shot of Calvert before she left for the bar and that she drank a "hunch punch" when she arrived at the bar. She stated that she was outside when the victim was talking to the Defendant. She heard the victim when he said, "I don't like you, and you don't like me. Don't disrespect me, and I won't disrespect you." Ms. Johnson did not see the victim and the Defendant fighting because she had walked to her car. She thought "they were just going to squash everything" until she heard two gunshots. When she ran back to the victim, she saw the victim taking his shirt off to examine himself. She stated that she also saw the Defendant and a man named Shelby Harris running along the right side of the building away from the victim. She testified that she went inside the bar and told Ms. O'Neal that "her baby's daddy had shot [the victim]." After talking to Ms. O'Neal, Ms. Johnson drove the victim to the Marshall County Medical Center.

Ms. Davis testified that she was also outside of the Soul Train Bar and Grill when the victim and the Defendant were fighting. She testified that she saw the Defendant smack the victim in the face. She said that after the Defendant smacked the victim, the victim hit the Defendant. Ms. Davis testified that the Defendant was losing the fight and that the victim was still hitting the Defendant when the Defendant pulled out his gun and shot the victim. She said that she did not see what happened next because "she took off running on the side of the building when [she] heard the gunshot." When she returned, she saw that the victim was bleeding "somewhere in the chest area."

Dr. Jose Diaz, a general surgeon and associate professor in the trauma, critical care, and surgery division at Vanderbilt University, treated the victim at Vanderbilt Hospital. Dr. Diaz testified that the victim was shot "just above his sternal notch" and that the victim was also injured in the "right posterior axillary area," which is "just underneath the armpit area." This second injury was inflicted when the bullet exited the body. Dr. Diaz stated that the bullet went through the "right thoracic cavity in the lung" and that as a result, the victim "had bleeding into the thoracic cavity or chest wall cavity." He stated that the injury to the lung also resulted in "pneumothorax, which is air trapped within the thoracic cavity" and that the air in the thoracic cavity escaped into "the chest wall area." He testified that he placed a chest tube into the thoracic cavity in order to "drain the blood and the air" and "reexpand the lung." He stated that the victim also fractured two of his ribs and that the victim had to take Fentanyl, a "very powerful narcotic medication" for his pain. Dr. Diaz testified that the victim stayed at Vanderbilt Hospital for approximately five

days. He said that [the] victim's injuries were life-threatening and that the victim was in extreme physical pain until he was given medication.

Amanda Newcomb of the Lewisburg Police Department testified that she was dispatched to the Soul Train Bar and Grill sometime between 1:00 and 2:00 a.m. on the morning of May 11, 2008. When she arrived, she attempted to talk to the 10 or 12 people that were standing outside; however, everybody told her that they did not see anything. In her investigation with Sergeant Anthony McLean, who arrived approximately one minute after she arrived, they noticed blood on a car that was parked near the front door. They found blood on the sidewalk near the front door and a shell casing that was a "[c]ouple of inches" from the blood. They also found a trail of blood along the right side of the building. Sergeant McLean testified that the gray vehicle with the blood on the hood was approximately two feet from the front door of the bar and that the shell casing was found "within a foot" of the "passenger side of the front tire."

Officer Jason Lee of the Cornersville Police Department testified that on May 14, 2008, he saw an object "on top of the old factory directly behind the Soul Train" Bar and Grill. Because he believed that this object might be the Defendant's gun, he contacted Detective Sergeant Jimmy Oliver, who was the lead detective handling the Defendant's case. When Detective Sergeant Oliver arrived, he went onto the roof and found what was believed to be the Defendant's gun. Officer Lee then identified photographs of the gun and the location in which it was found. Officer Lee testified that a "[s]wirl mark" on top of the building near the gun indicated that the gun had been thrown onto the roof and then slid across the top of the building. He stated that there was a bullet in the chamber of the semiautomatic weapon and that there was also a magazine inside of the weapon.

Detective Sergeant Oliver of the Lewisburg City Police Department testified that he was notified about the altercation at the Soul Train Bar and Grill and that he arrived after Officer Newcomb and Sergeant McLean arrived. He identified several photographs that he took in the Soul Train Bar and Grill parking lot and a 9 millimeter shell casing that he recovered from the crime scene. He stated that he did not find the bullet at the scene but that he noticed a dent in a nearby car that was likely caused by the bullet. He said that he found blood on the hood of the dented vehicle. He also found blood in several places on the ground. He found blood toward the front of the Soul Train building and to the left of the dented vehicle, in the alleyway to the right of the building, and in various spots on the sidewalk in front of the building. He

-4-

stated that with the help of Officer Lee, he located a 9 millimeter semi-automatic weapon on top of the building behind the Soul Train Bar and Grill. Detective Sergeant Oliver then identified the 9 millimeter weapon, the 9 millimeter round that was found in the weapon, and the magazine that was found in the weapon.

Detective Sergeant Oliver testified that the Defendant was found in Memphis on May 27, 2008. On cross-examination, Detective Sergeant Oliver testified that the Defendant had "an older scar" above his eye when he was found in Memphis and that the blood found along the side of the Soul Train Bar and Grill likely belonged to the Defendant because the victim did not go in that area after he was shot.

Suzanne Lafferty of the Tennessee Bureau of Investigation (TBI) crime laboratory in Nashville testified that she did not find any fingerprints on the cartridge from the magazine found in the weapon or on the cartridge found in the chamber of the weapon.

Alex Brodhag of the TBI forensic services division testified that through his examination of the weapon involved in this case, he was able to determine that the cartridge that was found in the weapon had been chambered and extracted from the pistol but not fired from the pistol. He testified that he also examined the shell casing that was recovered from the crime scene and that he believed, in his expert opinion, that the shell casing was fired from the 9 millimeter weapon that was found on top of the building next to the Soul Train Bar and Grill.

Jenise Nelson of the Marshall County Circuit Court Clerk's Office testified that the Defendant was convicted of possession of cocaine with intent to sell and possession of cocaine with intent to deliver on March 11, 2002. The judgments reflect that the trial court merged these two convictions and sentenced the Defendant to 12 years.

Dr. Jeffery Jordan, an optometrist of the Advanced Eye Care Clinic, testified for the defense. Dr. Jordan stated that he examined the Defendant in August 2008 because the Defendant complained of "flashes of light in his vision and black spots in his vision." He stated that black spots in patients' eyes are generally caused by what he calls "floaters" and that flashing lights in patients' eyes are generally caused by jelly in the eye that moves back and forth, pulls the retina, and fires the photo receptors, causing the patient to receive an

"electrical stimulation of a flashing light." He stated that the Defendant's condition would be normal for someone in their 60s or 70s because the "jelly" in the eye tends to "shrink up with time" and "pull[ ] off of the retina" as it shrinks, which causes the flashing lights. Dr. Jordan testified that if a young patient is experiencing these kinds of symptoms, then the condition is generally trauma-related. Dr. Jordan stated that the Defendant told him that he had been struck in the left eye. Dr. Jordan testified that "blunt trauma would most likely have caused the floaters and the syneresis, which is the jelly that coagulates in such a young patient." On cross-examination, Dr. Jordan admitted that the Defendant's injury did not impact his vision but stated that the Defendant's condition would never improve.

*State v. Jonathan Doran Tears,* No.M2009-01559-CCA-R3-CD, 2010 WL 4674264, at *1-2 (Tenn. Crim. App. Oct. 26, 2010).

*Post-Conviction Hearing*

Petitioner testified that he was represented by two members of the public defender's office who will be referred to as trial counsel and co-counsel. He also spoke with the Public Defender a couple of times. Petitioner denied talking with any investigators from the public defender's office. Petitioner claimed that he brought the issue of self-defense to the attention of his attorneys, and they briefly discussed it. He said, "But it was like everything that I brought to their attention, they somewhat shot down, like it was irrelevant." Petitioner testified his attorneys said that they would check into the issue, but they were "just nonchalant" about it.

Petitioner testified that he later received paperwork from "a friend of [his] on the streets" which showed the "parameters you have to cover to prove self-defense in a case." He gave the paperwork to trial counsel, but they never discussed it. Petitioner testified that trial counsel and co-counsel indicated that they were having trouble locating witnesses and that self-defense would be hard to prove. Petitioner testified that he brought up self-defense every time that he spoke with his attorneys. He said that they did not review the elements of self-defense with him. Petitioner testified that he discussed with trial counsel and co-counsel whether Petitioner landed the first blow to the victim, and Petitioner told them that he did not. However, he admitted that Ashton Davis testified that Petitioner pushed the victim "upside" the head. Petitioner did not consider that a blow. Petitioner testified that trial counsel and co-counsel said that it would be hard to show self-defense because Petitioner touched the victim first.

Petitioner testified that he told trial counsel and co-counsel about witnesses for his defense. He told them that he had learned from "mutual friends" that Shelby Harris was present on the night of the offenses and that Mr. Harris and the victim had a verbal confrontation before Petitioner arrived at the bar. Petitioner testified that he told the Public Defender's Office that Mr. Harris was a potential witness, and he made it clear to them what Mr. Harris' testimony would be. Petitioner said that he also informed trial counsel and co-counsel about "Mr. Conger, Jr." who was the "doorman" at the bar, and a bar employee named "Tasha" who witnessed the victim being removed from the bar for being unruly with other patrons. Petitioner testified that he told trial counsel and co-counsel about Daron Little and Alex Harris, who had told Petitioner's girlfriend that he was present at the time of the offenses and that he was available to testify.

Petitioner testified that he initiated conversation with trial counsel and co-counsel about the possibility of expert testimony. However, trial counsel said that the testimony would not be relevant. He testified that the Public Defender also informed him that the public defender's office was going through a "budget crisis" and that the court would not pay for an expert witness. Petitioner testified that he was also told to bring the issue up on post-conviction. He said that no motion was filed requesting an expert witness, and he believed that a ballistics expert could have proven that the victim was untruthful about the way the shooting happened. Petitioner thought that proof about the trajectory of the bullet and the victim's wounds would have proved the victim was lying. He said that he asked about a ballistics expert every time that he met with his attorneys. Petitioner testified that DNA analysis could have been used to prove that blood found at the scene on the car belonged to Petitioner where his eye had been cut rather than the victim.

Petitioner testified that the only witness to testify on his behalf at trial was "Dr. Jordan," who testified about Petitioner's eye injury. He said that trial counsel and co-counsel said that they could not find any other witnesses. Petitioner testified that from the beginning, trial counsel and co-counsel told him that it would not be in his best interest to testify. Although he thought that the jury should hear his side of the story, Petitioner agreed with trial counsel's position that his testimony "wasn't worth the gamble" due to his criminal record. He had prior convictions for simple possession, facilitation of a felony - aggravated robbery, possession of a weapon, possession of cocaine for resale, and simple possession of a Schedule VI drug.

Petitioner testified that Shelby Harris was present at trial because he had been subpoenaed by the State. However, the State did not call Mr. Harris as a witness. Petitioner claimed that he asked trial counsel to call Mr. Harris to the stand, but trial counsel refused stating that he was not allowed to call Mr. Harris as a witness because he had been subpoenaed by the State, and the State did not call him to the stand.

Petitioner testified that he never discussed the victim's statement with trial counsel and co-counsel and that he brought the victim's statement to their attention. He said that he first noticed the statement at the sentencing hearing and that the statement went against the victim's trial testimony. He said that neither trial counsel nor co-counsel requested the victim's statement after the victim testified at trial even though he asked them about getting the statement. Petitioner testified that he also brought the victim's testimony at the preliminary hearing to counsel's attention.

Petitioner testified that he never discussed Felice O'Neal's statement or Tangelina Alexander's statement with trial counsel or co-counsel. They also did not discuss a payment of $20,000 made to the victim. Petitioner testified that he wanted trial counsel and co-counsel to see if they could get a toxicology report to show that the victim had been using cocaine and alcohol heavily. However, trial counsel informed him that the report would be impossible to obtain.

Petitioner testified that he wanted his attorneys to find out why the victim was allowed to "com[e] back and forth to court" to testify against him when the victim was supposed to be serving "county time" for non-payment of child support. He said that trial counsel and co-counsel said that they could not ask the victim about the child support violation because it was a "civil matter" and not relevant. Petitioner thought that "some kind of deal" had to have been made "to keep him on the street[s]." However, he admitted that the victim served six months in jail before Petitioner's trial. Petitioner testified that the testimony of Ashton Davis was different than that of the victim. He felt trial counsel should have brought out those differences.

Petitioner testified that he did not meet with trial counsel or co-counsel after the sentencing hearing, and he was again represented by the public defender's office on appeal. He said that no one discussed a basis for the appeal with him, and they just sent him the "stuff" in the mail.

Shelby Harris testified that he was subpoenaed to court in Petitioner's case, but he was never called as a witness. He said that he was present for two days in a room downstairs in the courthouse, and he never spoke with anyone from the Public Defender's Office. Mr. Harris later gave a statement to post-conviction counsel, which would have been his testimony at trial. In the statement, Mr. Harris said that he saw Petitioner shoot the victim while the victim was still beating Petitioner. However, in his statement to police, Mr. Harris had said that he was inside the bar and did not see the fight or the shooting. Mr. Harris claimed that he lied to police and that his statement to post-conviction counsel was truthful. He admitted that he did not initially talk with police at the bar after the shooting. He later gave a statement to Detective Jimmy Oliver.

-8-

Jared Robinson testified that he was present at the Soul Train Bar in 2008, and he saw what happened during the shooting. He was never contacted by anyone and later provided post-conviction counsel with a statement. In the statement, Mr. Robinson indicated that he saw the victim and Petitioner fighting and that the victim had Petitioner "spread out on the hood of a vehicle, punching him repeatedly in his face." He further stated that when he heard the gun shot, the victim was still on top of Petitioner beating him. On cross-examination, Mr. Robinson testified that he did not wait for police on the night of the shooting and left the area. He claimed that he did not want to get involved in anything. Mr. Robinson said that he heard a gunshot but never saw a gun. He saw Petitioner run away after the shot was fired. Mr. Robinson testified that four or five of Petitioner's friends were outside the bar on the night of the shooting. He thought that Petitioner would be seriously injured or killed, but he never attempted to separate Petitioner and the victim.

Zeldra Swaggerty testified that she was also present during the shooting and was never contacted by anyone. She gave a statement to post-conviction counsel. In the statement, Ms. Swaggerty said that she saw the victim beating Petitioner and that he threw Petitioner on a car. She said, "While on the ground fighting, the gun went off. It was close range during [a] fight." On cross-examination, Ms. Swaggerty testified that she left the bar before police arrived because she was pregnant at the time. She later went to the hospital, and police were also there. She never told them that she saw what happened. Ms. Swaggerty admitted that she did not tell anyone what happened even after knowing that Defendant had been arrested. She also did not tell Petitioner's family that she was a witness. Ms. Swaggerty testified that she never went inside the bar on the night of the shooting, and there were six or seven people standing outside the bar at the time. Ms. Swaggerty testified that Adrianna Cross was with her, and she parked in front of the bar and was standing beside her car at the time of the shooting. She said that she was "not even a foot" from the shooting but, that she did not see a gun or who pulled the trigger.

Adrianna Cross testified that the victim is her cousin, and she knew Petitioner very well. She saw what happened during the shooting but was never contacted by anyone about the case. Ms. Cross later gave a statement to post-conviction counsel. She testified that she had previously been represented by the public defender's office, and she knew where the office was located. Ms. Cross testified that she was standing approximately five feet away and saw the victim hit Petitioner with a bottle. She also noticed that the victim's eyes were "glazed." She then saw Petitioner shoot the victim. Ms. Cross testified that she rode to the hospital with Ms. Swaggerty after the shooting to check on the victim. She saw sheriff's deputies at the hospital, but she did not tell them that she witnessed the shooting. Ms. Cross admitted that when she later learned that Petitioner had been arrested, she did not contact law enforcement because it was not "her place" to do so.

Darron Little testified that he was present at the Soul Train Bar during the shooting. He was with Shelby Harris and witnessed the victim causing trouble with Petitioner. Mr. Little testified that the victim was drinking and snorting cocaine and was later removed from the bar for trying to start fights. Mr. Little testified that he grew up with the victim and Petitioner, and he was trying to help the victim stay out of trouble. He heard the victim say that he did not like Petitioner. Mr. Little admitted that he did not see the victim approach Petitioner nor did he see how the fight began. He was inside the bar when he heard the gunshot. Mr. Little testified that after the shooting, he saw that Petitioner was injured, and his eye was swollen shut.

Mr. Little testified that approximately ten people called him after the shooting to talk about the incident. He said that the shooting was discussed among social circles at the bar. From his discussions with other people, Mr. Little knew who was present at the bar at the time of the shooting. Mr. Little testified that he was never contacted by anyone about the case, and he never spoke with police. The first person he informed about his knowledge of the events was post-conviction counsel.

On cross-examination, Mr. Little testified that there were many people in the bar at the time of the shooting. He thought that Jerrod Robinson was probably outside the bar. Mr. Little remembered seeing Ms. Swaggerty and Ms. Cross at the bar on the night of the shooting, and he saw them inside the bar at some point and also outside of the bar. He did not recall where Shelby Harris was located when the shooting occurred. Mr. Little testified that he saw the victim using cocaine outside of the restroom "where everybody stands at. Me, him, Mr. Harris, and probably some other ones that was doing it with him." Mr. Little testified that he did not use any cocaine, and he did not know who provided the substance. He admitted that he had been drinking beer that night. Mr. Little testified that he was incarcerated for the sale of a Schedule II drug at the time of the post-conviction hearing. He had also been convicted of simple assault and aggravated assault, and he had other convictions for the sale of Schedule II drugs.

Mr. Little testified that he was inside the Soul Train Bar when police arrived, and he did not speak to them. He said that he had no reason to speak with them, and he went home. Mr. Little testified that he did not attempt to contact Petitioner's attorneys. He admitted that he and Petitioner were housed in the same penitentiary.

Alexander Harris testified that he witnessed the events at the Soul Train Bar, and no one contacted him about it. He first spoke with post-conviction counsel about it in 2011 and gave a statement. He said that he would have testified in accordance with the statement if he had been called to testify at Petitioner's trial in 2009.

On cross-examination, Mr. Harris testified that he witnessed the shooting and saw the gun that he described as a black pistol. He thought that Petitioner was on the hood of a car and, that the victim was on top of petitioner hitting him when Petitioner retrieved the gun from his back pocket. He did not recall how Petitioner held the gun when he shot it. Mr. Harris admitted that he had three prior convictions for the sale of crack cocaine.

Mr. Harris testified that he had been sitting in the car with the victim approximately thirty minutes before the shooting. He explained that he was only seventeen years old at the time and could not go into the bar. Mr. Harris said that when Petitioner drove up, the victim indicated that he was going to "whip" Petitioner. Mr. Harris said that the victim "jumped out of the car and went down there and did what he said he was going to do." He thought that the victim had snorted a gram of powder cocaine while he was in the vehicle. Mr. Harris testified that he did not use any cocaine while in the car and that he smoked a cigarette. He said that he rode to the bar with Mr. Robinson who was inside at the time. Mr. Harris testified that he saw Petitioner run away from the scene. Mr. Harris then ran across the street to the "projects" and then walked home.

Mr. Harris testified that his statement indicated that Petitioner acted in self-defense. He knew Petitioner was later arrested; however, he never attempted to tell Petitioner's attorneys what happened even though they were also representing Mr. Harris on other charges. He said that he was worried about himself at that point. He also did not feel that it was his "place" to tell police what he saw because it did not "involve" him. Mr. Harris admitted that if someone from the public defender's office had talked to him after the shooting, he would not have told them anything. On redirect, Mr. Harris acknowledged that he had told post-conviction counsel that he was not going to cooperate at the post-conviction hearing.

Trial counsel testified that he and co-counsel filed for and received discovery in Petitioner's case, and they reviewed the materials with Petitioner. They also reviewed the State's witness list with him. Trial counsel testified that there were two investigators for the public defender's office that were assigned to assist in investigating and preparing Petitioner's case. The investigators were used to "try to track down witnesses in this case."

Trial counsel testified that co-counsel handled the preliminary hearing in Petitioner's case, and trial counsel later discussed the hearing with him. The tape of the preliminary hearing was also transcribed. Trial counsel and co-counsel met with Petitioner "numerous times" during court appearances and at the jail for a minimum of eleven times. They discussed the facts of the trial, strategy, punishment, settlement, trial, and potential defenses numerous times. Trial counsel testified that self-defense was discussed "quite a bit" and that

-11-

it was their trial strategy. He said that Petitioner was not the only one who brought up the discussions on self-defense.

Trial counsel was familiar with a statement by the victim that was later reproduced in the presentence report in its entirety. When asked by the assistant district attorney general if he was familiar with the statement before trial, trial counsel testified:

> We were familiar with what was going on with it, because I had spoken to you informally numerous times, and also Detective Oliver. I found out a lot of informal discovery about the case.

> And you had told me that Detective Oliver had went down to the hospital to talk to [the victim] while he was still under the effects of medication. I believe you also told me that he went back a couple of days after that, after he got out of the hospital, which if I remember right, I don't think he was in all that long. Maybe two or three days, at the most.

Trial counsel said that the content of the statement did not "throw [him] for a loop or anything like that." He said that it was not unusual for him to be given open file discovery from the district attorney general's office in a case. Therefore, he was already acquainted with the statement when it came out in the presentence report.

Concerning self-defense, trial counsel testified:

> Self-defense was a problem for a number of reasons. We didn't completely rule it out. We probably were pessimistic with [Petitioner] about it. Sometimes it did get contentious over that issue. But he had several problems going in because he was the only one that was armed with a gun.

> He had a felony record for sale of cocaine.

> What it amounted to was, it started out as just a fistfight, and [Petitioner] started the fight. So he had numerous things that were problematic.

> The best thing we had going for us was the fact that Dr. Jordan was willing - - well, "willing" may be a strong word. We subpoenaed Dr. Jordan to get him up here, and he was going to relate that the - - I guess the term is cobwebbing or lines that [Petitioner] sees out of his left eye; and also, the auras or lights surrounding things, that that is consistent with being hit by a lot of blunt-force trauma.

-12-

Trial counsel testified that Petitioner gave him and co-counsel the names of Bill Conger, Jr., Bill Conger, Sr., Petitioner's ex-girlfriend Ms. O'Neal, Telia Alexander, Andrea Locke, and Ashton Davis as potential witnesses. Trial counsel testified that his office then attempted to contact the individuals. He said that an investigator spoke with Bill Conger, Jr., and he was "more problematic than helpful." Mr. Conger, Jr. said that the victim was told to leave the bar and "cool down," but he was not "kicked out" of the establishment. However, he said that Petitioner had been told the night before not to come back. Trial counsel did not recall anything of "substantial assistance" from Bill Conger, Sr. Trial counsel remembered seeing Shelby Harris' name on the witness list, but Petitioner did not say anything about Mr. Harris. Concerning Ashton Davis, trial counsel testified: "Ashton Davis was not forthcoming with us. The information she told us was not consistent with that she said at trial." However, when called as a witness, Ms. Davis' testimony "helped us quite a bit." Trial counsel testified that Petitioner did not provide the names of Alexander Harris, Darron Little, Jarrod Robinson, Zeldra Swaggerty, or Adrianna Cross. Trial counsel did not recall any of Petitioner's family members contacting him with information about the witnesses in the case.

Trial counsel testified that he was sure that he and co-counsel went over the elements of self-defense, but he did not recall seeing any paperwork from Petitioner on the subject. He noted that discussions with Petitioner about self-defense "ranged from tense to very contentious at times." Trial counsel testified:

> He didn't like what we had to say about self-defense because we had to point out the problems that we had with it. He didn't like what I had to say about the problems with trying to get an expert regarding ballistic trajectory.
>
> It wasn't that I said we couldn't get the funding for it. It is the fact that the trajectory expert wouldn't have helped because it was in contention about where the people were standing.
>
> They have to have fixed positions and know a lot about the scene in order to be able to accurately say what is going on when it comes to trajectory.

Trial counsel denied telling Petitioner that money was the issue concerning a ballistics expert rather than the facts. He said, "We probably told him that the judge would not give us one on the basis that we didn't have anything solid to go on, as far as the trajectory expert would be. And the AOC doesn't like to hand out experts for no reason." Trial counsel did not recall Petitioner telling him that other funds were available for an expert, and he "would never tell him that it would be unethical for us to get an expert from our clients."

Trial counsel testified that he would never have told Petitioner that he could not call Shelby Harris as a witness. He said, "At that point in the trial, I definitely did not want to call Shelby Harris because I would not have known what Mr. Harris was going to say. Trial counsel also felt that he and co-counsel did a good job of painting the victim as intoxicated at the time of the shooting. Trial counsel got the victim to admit to drinking a minimum of five or six shots, and he admitted to drinking two 12-ounce gin and juices.

Trial counsel testified that all he argued at trial was self-defense in both opening and closing statements, and through his examination of witnesses he tried to establish self-defense. A self-defense instruction was also given by the trial court. Trial counsel said that Petitioner was "irritated" because trial counsel thought that Petitioner would have been better off to take the State's fourteen-year offer rather than gambling on self-defense. Trial counsel testified:

> We had some good medical evidence from Dr. Jordan. But at the same time, you had someone that the jury was going to hear was a felon, because of the charges that were involved related to the handgun. And if he testified, they would hear about, at the very minimum, his sale of Schedule II. And he was going to a bar with a gun in his pocket.
>
> He started the fight by what they call mugging the other guy, by smacking him or hitting him in the face.

Trial counsel testified that there was nothing in the medical records to indicate that the victim had been using cocaine. He checked with Vanderbilt Medical Center and could not find anything indicating that there was a "tox screening or [the victim] being on any sort of drugs." Trial counsel testified that he spoke with Detective Oliver about the allegation that the victim hit Petitioner with a bottle. There was no evidence of a bottle found at the scene. Trial counsel testified that he got the victim to admit that he was beating Petitioner "pretty badly before he was shot."

Trial counsel testified that the victim was awarded $20,000 from the Criminal Injuries Compensation Fund to cover some of his medical bills. The money was not to "pay off" a witness. Trial counsel knew that the money was going toward medical bills.

Trial counsel testified that a brief was prepared in Petitioner's case and a copy was sent to him. He did not recall receiving any communications from Petitioner about the appeal.

Concerning statements by Felice O'Neal and Tangelia Alexander, trial counsel testified:

We, at the very least, attempted to speak to Tangelia Alexander. I am pretty certain they got [in touch with] her. And she didn't know - - when I say "they" I mean [Investigators] Marshall Campbell and Fred Holloway.

She didn't really know anything about the incident. She didn't see it happen.

Ms. O'Neal, which I believe was either [Petitioner's] ex-girlfriend or girlfriend at the time, he could tell us himself that she didn't see anything because she was actually in the club, so she didn't really know anything, either.

Trial counsel admitted that Ms. O'Neal's and Ms. Alexander's statements referred to communications after the shooting. In Ms. O'Neal's statement there was mentioned a picture of Petitioner's eye where the victim had hit him. This photograph was retrieved from Ms. O'Neal's cell phone. Trial counsel testified that the information was provided through discovery.

Concerning the statements, trial counsel testified:

We couldn't really use them because anything that was told to Tangelia Alexander was hearsay because she didn't actually see what happened. I think she spoke to [Petitioner] after the fact, but she didn't see anything, so she had no firsthand knowledge.

Trial counsel testified that Ms. O'Neal's statement was also hearsay because she was inside the bar at the time of the shooting. He said, "The only thing pertinent that she provided was the picture of [Petitioner's] eye."

Concerning Petitioner's appeal, trial counsel testified:

We keep our clients informed by showing them everything that is filed. But appeals are strictly legal arguments, so it is up to the attorney to determine what the valid legal arguments would be, which in this case, it was sufficiency of the evidence and sentencing, and that was it. I didn't see any other issues.

Trial counsel noted that in addition to being sent a copy of everything that was filed, Petitioner would have been sent a copy of "[a]nything that comes through," including the opinion. Trial counsel did not recall receiving any complaints from Petitioner about the issues that were raised.

-15-

On cross-examination, trial counsel testified that the first time he saw the victim's statement word for word was in the presentence report. However, he knew what the victim was going to say from talking to Detective Oliver and the prosecutor about the case. There had also been a preliminary hearing. Trial counsel testified that he found out what the victim had said through "informal discovery." He noted that the victim had given two different statements. "One was when he was under the effects of the medication. Then he have another one, which placed him closer to the car." Trial counsel testified that he first saw the statement by the victim which read, "We were scuffling up against a car, and I heard like a pow noise and I let off of John-John," printed in the presentence report. However, he was "generally" told about the statement. Trial counsel acknowledged that at trial, the victim testified that when he was shot, he had already let go of Petitioner and had stepped back from Petitioner. The following exchange then took place concerning the victim's testimony:

| [Post-conviction Counsel]: | - - prior to being shot?<br><br>Now, in the Court of Criminal Appeals' opinion on this case - - have you had an opportunity to review that opinion? |
| --- | --- |
| [Trial Counsel]: | Yes. It has been a while, but I have read over it. |
| [Post-conviction Counsel]: | Do you recall in that opinion of the Court of Criminal Appeals specifically mentioning this step back as a factor into their opinion? |
| [Trial Counsel]: | They are going to look at things in the light most favorable to the State on appeal because they are not going to reexamine the witnesses and decide who is lying and who is telling the truth. |
| [Post-conviction Counsel]: | Now, in the statement of [the victim] that I previously provided to you, I believe it is, I think, the second or third sentence there, could you read me what that statement actually says with respect to their physical proximity at the time of the gunshot? |

| | |
|---|---|
| [Trial Counsel]: | "The next thing I know, we were scuffling up against a car, and I heard a, like a pow noise, and I let off of [Petitioner] and grabbed my throat. There was a crowd of people yelling for me to get down, and I remember taking my shirt off and going to the ground." |
| [Post-conviction Counsel]: | That statement there, does that seem to you to be consistent with him letting off prior to the shot, the fight being over, and him taking a step back? |
| [Trial Counsel]: | No, it is not, but it is consistent with what Ashton Davis said on the stand. |
| [Post-conviction Counsel]: | It is consistent with what Ms. Davis said, but not what [the victim] said? |
| [Trial Counsel]: | Yes, sir. |
| [Post-conviction Counsel]: | After [the victim] testified to these things, did you then request that the State give you a copy of his statement, this statement right here, prior to cross-examining him? |
| [Trial Counsel]: | I don't remember if I asked for Jencks material on him or not. |

Trial counsel testified that he referred to the transcript of the preliminary hearing during his cross-examination of the victim.

Trial counsel did not recall the victim denying alcohol consumption. He noted that at trial, the victim "admitted to drinking two 12-ounce gin and juices." The victim further admitted that he drank multiple shots of liquor, "maybe as many as five per 12-ounce, which would put in easily over six, probably closer to ten shots, in about 20 minutes before this scuffle happened, this shooting." Trial counsel agreed that the victim's statement in the presentence report, that he could not recall what occurred because he was too drunk, to a certain degree comported with his trial testimony because the victim admitted to drinking

"quite a bit of alcohol." Trial counsel acknowledged that in his statement to police, the victim said due to his alcohol consumption, he did not recall why he went to talk to Petitioner. At trial, the victim testified that he went to talk to Petitioner because they had argued in the past. The victim also remembered the exact details of why he approached Petitioner. Trial counsel admitted that the victim's testimony was inconsistent with his statement to police; however, trial counsel testified: "Yes, but that doesn't really help any because, once again, we are in a situation where we had a guy that was unarmed that was shot." Trial counsel felt that the differences between the statement and the victim's trial testimony was a "very minor ding on his credibility, at best."

Trial counsel testified that he and co-counsel had worked out a plea offer for Petitioner to aggravated assault and a felony weapons charge with a sentence of fourteen years instead of attempted second-degree murder. However, Petitioner did not want to accept the plea and was "belligerent about that." Trial counsel felt that the trial could have gone either way. He argued to the jury that Petitioner suffered serious bodily injury by the victim and that Petitioner's actions involved reasonable force. However, trial counsel noted that Petitioner had a criminal history, went into a bar, and started a fight. Trial counsel testified that although some of the witnesses at the post-conviction hearing indicated that the victim started the fight by hitting Petitioner with a bottle, there was no evidence of a bottle found at the scene. Trial counsel testified that his major concern with Petitioner's case was that he was in the middle of a fight with someone, pulled out a gun, and shot him.

Trial counsel testified that he did not recall Petitioner giving him a phone number for Shelby Harris. He first became aware that Mr. Harris was a potential witness when he received discovery. When asked what efforts were made to contact Mr. Harris, trial counsel testified:

> I don't recall specifically what efforts we went through. I assume that the investigators - - I probably told the investigators to look for him. But [Petitioner] never really focused on Shelby Harris at all. He focused on Andrea Locke, Tangelia Alexander, Ms. O'Neal, but not even her so much as those two, plus Aston Davis. Those were really the three that he focused on: Davis, Alexander and Andrea Locke, and Conger. Sorry.

Trial counsel noted that if Petitioner had told them that Mr. Harris was outside and witnessed the fight, they would have tried to "track him down." He said that were "plenty" of people on the State's witness list who had "major and minor roles." They tried to focus on the witnesses that Petitioner told them were present and knew something about the case.

Trial counsel testified that he knew Mr. Harris was present during the trial. When it became obvious that the State was not going to call Mr. Harris as a witness, trial counsel testified that he and Petitioner may have had a conversation about calling Mr. Harris to testify. However, trial counsel said: "[I] was not going to call a witness that I didn't know what he was going to say when things were going pretty well, based upon Ashton Davis' testimony; and also on Mr. O'Neal's testimony about admitting to being highly intoxicated and also saying that they had problems in the past. That was really a gamble."

Trial counsel noted that Ashton Davis was a "very reluctant witness." Trial counsel testified:

> She did not admit to what she admitted to on the stand. I recall that. She did not say anything about actually seeing what occurred and that [the victim] had him down on the car, which she did say at trial.

Trial counsel testified that the defense did not call any eyewitnesses at trial. He noted that they "relied on the ones that the State called and cross-examined them." They did not know about any of the witnesses who testified at the post-conviction hearing.

Concerning Alexander Harris, trial counsel testified that if Mr. Harris had told them that he saw the victim consume cocaine immediately before Petitioner approached and attacked him, it could have helped Petitioner's case. However, trial counsel noted that Mr. Alexander, whom they were also representing at the time, did not come forward with any knowledge of the case. Trial counsel testified: "I didn't know Alexander Harris knew anything about this."

Trial counsel testified that the payment to the victim from the Criminal Injuries Compensation Fund was a nonissue to him. He said:

> People that are victims of crimes get money from the compensation fund. That money is going to go to pay hospital bills. In my opinion, it would be unethical for me to try to paint it as he is being bribed by the State because that it not what it is.

Trial counsel did not believe that payment of the money would go to the credibility of the witness. Trial counsel further testified:

> Now, if it was $20,000 in cash that was going into [the victim's] pocket, then I could see that being compounding a crime, which is a crime itself, but that is not what is going on here. That is going to pay medical bills.

-19-

Assistant Attorney General Weakley Barnard testified that he was assigned to prosecute Petitioner's case. Concerning the victim's statement, Mr. Barnard testified:

My recollection of what happened in that statement is as follows:

With the Public Defender's office, they file a letter of discovery, which had been approved by the Court and agreed to by our office many years ago.

Then the State filed a written response to that discovery. And typically, here in Marshall County - - I don't know how it is done in the other three counties of our district; it's just sort of the way I have done it - - the Public Defender's office, unlike many private practitioners, has a good portion of our caseload. We have 100 percent. My speculation is they have a good 75 percent of the 100.

It has been my policy to file the written discovery and to also have a semi open file discovery with them. Also, if there is a situation that I think they need to be made aware of, then I specifically point out situations with them.

As an example, the last trial we had, I let them look at our file. I let them look at our witness list. I let them know what order of proof. I probably did that in this case. It is typically what I do with them because I know they are under the same pressures that we are.

In this particular case - - we were - - early on in the investigation when I became aware of the case, we had, at the time, I think one witness who had actually come forward and named the defendant as the shooter.

We pretty much - - "we," being law enforcement, me working with them - - they pretty much knew and had told me that they had figured out that [Petitioner] was the shooter in the case.

But I was still concerned about having as many witnesses as we could possibly have to put the gun in his hand and make him the shooter, for trial purposes, if we got there.

As this point in time, I did not know and could not find out, because we have the same problem with Vanderbilt that defense counsel suggested that he had when he tried to call them - - we cannot call up there and find out the condition of a patient, even if he is a victim. They are claiming that comes under the

-20-

federal legislation. I have always disagreed with them during - - about an investigation. I point out the legislation to them. But they - - I can't get them off of dead center.

I cannot call up there, nor could the detectives call up there and find out [the victim's] condition.

I sent Detective Jimmy Oliver, at my request, to go up there and communicate with [the victim] for one specific fact - - well, actually two - - to find out whether he was going to live or die, because at the time we didn't know.

Two, if he was available to answer a question, to determine whether or not he could identify his shooter, because I did not have - - I had absolutely no interviews with him the night of the shooting, no statements from him.

Detective Oliver went up there on May 13 and spoke to [the victim].

Mr. Oliver came back and told me that he was highly sedated, but he brings back the statement - - I can't remember what - - the exhibit number, but the statement that was taken on - - excuse me. It's Exhibit Number 16.

He obtained that statement at that time and brought it back to me.

I looked at the statement. He named the shooter. And I put that aside until he got out of the hospital, which was a few days later.

The defendant - - or excuse me.

The victim and his mother, without invitation, didn't know they were coming, came by my office. And he had a lot of concerns about the statement that he gave to Detective Oliver.

He pointed out that he was under sedation, pain medication, whatever, and he really didn't know what he told Detective Oliver.

I handed him a copy of his statement, which is what I had, not the original.

And he told me that the statement was incorrect. He pointed out that - - he didn't deny he had been drinking. He didn't deny he went outside. He didn't deny that he and [Petitioner] had words.

-21-

But when it says, "I can't remember because I had been drinking," he denied that. He said, I do remember. He explained to me how he remembered.

Then it says, "The next thing he knew, we were scuffling up against the car and I heard a pow noise."

He told me at the time that was true, but that he had backed up. Now, we are not talking about 20 foot. He just let go of him is what it amounted to.

He said, "I let off of [Petitioner] and grabbed my throat." He said that wasn't in the correct order.

He said there was a crowd of people yelling for me to get down. He admitted that that was factual.

"I remember taking my shirt off." I don't remember what he said about that because I wasn't - - that wasn't that important to me.

Then he said, "After that, I remember feeling my mother's breath on me and her saying, You have been shot and saying I was going to be okay and her and Tonja putting me in Tonja's car, and they took me to the ER."

Well both witnesses, the victim and his mother, said that it was not true. She wasn't there. She didn't see him until he got to the ER.

He said - - he was explaining to me, "When I was talking to Detective Oliver, I was out of it. I was under serious pain medication." He was still in the hospital when this statement was given.

"The next thing I remember, I woke up and [they] told me I was at Vanderbilt." Then it goes on to say the statement was written by Detective Oliver. I think he told me that was correct.

But we had a conversation. He told me there were - - that he disagreed with what was in this statement.

When it came time for discovery, I didn't feel the statement was exculpatory.

However, I did feel it was a possibility, depending upon how the trial went, if we have to have a trial, that hay could be made out of it.

I answered discovery. We discussed the case. We made an offer. And once I saw that an offer was not going to be accepted in this case, but before it was set for trial, my memory of this is that I spoke to the representatives of the Public Defender's office.

I showed them this statement. I explained the conversation that was had in my office with the witness, [the victim], and explained to them, if they used it - - and I am not talking about in a threatening way. I didn't explain it to them in a threatening way. I just explained to them what the explanation was going to be.

To my memory, they seemed to understand that.

The reason I was explaining the explanation to them, I didn't want to set them up by handing them a statement and not giving any explanation because I don't do the Public Defender's office that way.

And that is basically it about that. It is my memory that they did see the statement. They did read the statement. And I gave them the explanation of the meeting that would have taken place.

Mr. Barnard testified that the $20,000 paid from the Criminal Injuries Compensation Fund was not exculpatory, and it all went to Vanderbilt Medical Center for the payment of medical bills rather than to the victim. Mr. Barnard testified that the prosecutors never know anything about payments from the Criminal Injuries Compensation Fund. He said:

It goes directly to our victim witness coordinator. She handles all of the paperwork. It is handled out of the Marshall County office, but it is something I am basically unaware of.

The district attorney, not an assistant, but the district attorney has to sign off on the request.

Maybe in the 20 something years I have been down here since the Victim's Compensation Act has been going, I may have been asked about a case twice by the district attorney before he signed. I was not asked about this case. So I had no idea that any moneys had been given or anything else. So I was unaware of it.

Mr. Barnard testified that since he had no knowledge that a payment was made from the Criminal Injuries Compensation Fund, he did not use it as "some kind of hold over people, to say, you know, if you don't help us, we are going to get that money back."

On cross-examination, Mr. Barnard testified that he recalled showing the victim's statement to trial counsel before trial even though trial counsel testified that he was not shown the statement. Mr. Barnard said: "His memory is different than mine." He said that he did not believe the victim's statement could have been used to impeach his credibility with the explanation that he was sedated at the time he gave it.

With respect to the Criminal Injuries Compensation Fund, Mr. Barnard testified that he was not asked whether he thought the victim in this case should get the money. Mr. Barnard testified that the victim had to apply for the funds. He was not aware that the form to apply for the funds warned the victim that he must cooperate with law enforcement. Mr. Barnard testified that he learned that the victim had received the funds when Mr. Barnard saw it in the presentence report. He said that the victim-witness coordinator would have been aware of the application immediately. Mr. Barnard did not feel that money being paid on the victim's debt affected his credibility.

Co-counsel testified that he and trial counsel spent a substantial amount of time preparing for Petitioner's case. The focus of the defense was self-defense, which he and trial counsel discussed. Co-counsel testified that he handled the preliminary hearing, and a transcript of the hearing was prepared. He and trial counsel discussed his impressions of the state's witnesses. Co-counsel testified that other than Shelby Harris, he and trial counsel were not given the names of any of the witnesses who testified at the post-conviction hearing. None of them contacted the public defender's office indicating that they had any information. Co-counsel testified that the public defender's office did not have the resources to "conduct a door-to-door canvassing of a neighborhood, looking for people that might know information about something."

Co-counsel testified that he and trial counsel asked the investigators to try and locate witnesses on the State's witness list and speak to them. He said that they spoke with some of the witnesses, which probably would have been mostly law enforcement officers. Co-counsel noted that he and trial counsel typically spoke to the law enforcement officers who were typically in court, and the investigators spoke with the "out-of-court witnesses." Co-counsel testified that there were no surprises at trial, and they "knew what the witnesses were going to testify to."

Co-counsel testified that he was present at the sentencing hearing. After the sentencing hearing, he was aware of the victim's statement. He said: "It was similar to what

-24-

he had testified to, but different in the fact that he was - - he said he was still on top of [Petitioner]." Co-counsel could not say that he was surprised by the statement. Co-counsel testified that he was not aware of the $20,000 payment from the Criminal Injuries Compensation Fund until after the sentencing hearing. He did not consider the payment to be exculpatory information. Co-counsel did not feel that anything should have been handled differently in Petitioner's case. He said: "We felt we were very prepared for this trial."

The Public Defender testified that she was aware of Petitioner's case, and she participated in discussions about the case. She said:

> This was a fairly serious case. I was familiar with [Petitioner] from years way back. And I had reviewed the file. I kept up with [trial counsel's] and [co-counsel's] discussion. In fact, they came to me on several occasions, at one point because they felt they weren't making much headway with [Petitioner]. They had believed that there was some tenseness going on, and they didn't feel [Petitioner] was listening to them, and [Petitioner], from what they told me, didn't believe that they were listening to him.

> But we had reviewed the case, gone over it in-depth. And at one point, they came to me, [trial counsel] and [co-counsel], and asked me to go speak to [Petitioner] at the jail with them.

> An offer had been made. I reviewed that offer. I did feel that it was, actually coming from you [assistant district attorney], a very good offer, not one that we normally got. And I wanted to make sure that [Petitioner] understood what the offer was; that [Petitioner] understood what our belief in the case was. And I just merely wanted to make sure that there was full understanding before he turned down an offer of that sort.

> \*　　\*　　\*

> We did talk about the self-defense issues. Frankly, it was pretty much the only defense that we could go on, but it was a weak defense, at best. There were problems with it, one being the mere fact that [Petitioner] - - the information we had was that he was not supposed to be there.

> The other is that he brought a gun. And if my memory is correct, [Petitioner] was on parole, and he would have been a felon in possession of a weapon, and the fact that he brought a gun to this club, when he wasn't even supposed to be at the club.

The other was [Petitioner] himself admitted, not per se starting the argument, but the altercation, the physical altercation. In fact, up here on the stand he admitted to that, as far as what he calls a mugging. To me, that is more of a shoving or a push, but he did the initial hands on, put his hands on [the victim].

There was also the issue of flight. Flight can - - you can have a flight instruction that can go to guilt.

We went over those issues with [Petitioner]. Like I said, I have had [Petitioner] on many occasions, probably going back as far as 1995.

The Public Defender testified that she never spoke with Petitioner about obtaining an expert witness. She knew that Petitioner spoke with either trial counsel or co-counsel about the matter. The Public Defender noted that funds for an expert did not come out of her office budget. Instead, the funds were provided by the Administrative Office of the Courts. The Public Defender testified that her conversation with Petitioner became more tense when she suggested that he should seriously consider the plea offer. She did not tell him to take up any matters on post-conviction.

On cross-examination, the Public Defender testified that it was believed that there probably were several witnesses to the shooting at the Soul Train Bar. However, it was her experience that most witnesses do not want to get involved or come forward. The Public Defender testified that it is sometimes impossible to get witnesses to testify, and that she could not "make them testify as to what I think they truly saw, no." She noted that her office did not have the resources to "go out in the city of Lewisburg or Marshall County and do a canvas of, hey, did you happen to be at the Soul Train this date." The Public Defender testified that if law enforcement could not find the witnesses, "it is not realistic that we are going to find them because most witnesses, even if we find them, don't want to speak." She also noted that the two investigators from the public defender's office would not be asked to go out and find any witnesses who may have been at the Soul Train bar on the night of the shooting. She said: "That is not realistic, and I will not spend my resources that way."

The Public Defender believed the best way to find witnesses would have been for Petitioner to have given them some names. She said, "Then other witnesses that we do [sic] may find, we hope that they will tell us witnesses. I mean, it's sort of like a domino effect. In this case, we did not have this."

Mickey Campbell, an investigator with the public defender's office, testified that he interviewed the Congers, a father and son who owned the Soul Train bar, on separate occasions. He also attempted to talk with the doctors at Vanderbilt Medical Center, but they

refused to discuss the case without a waiver from the victim. Mr. Campbell testified that Mr. Conger, Sr., told him that Petitioner had been asked to leave the bar the night before the shooting, and further was told not to return. Mr. Conger, Sr., indicated that the incident had something to do with Petitioner's sister, her boyfriends, and some individuals from Columbia. Mr. Holloway testified that on the night of the shooting, Mr. Conger, Jr., stopped Petitioner at the door of the bar and would not allow him in. Mr. Conger, Sr., indicated that he did not see any conflict between the victim and Petitioner or the shooting. Mr. Conger, Sr., did not know the names of any other witnesses because he was inside the bar the entire time.

Mr. Campbell testified that Mr. Conger, Jr., told him that he stopped Petitioner from coming inside the bar on the night of the shooting. He did not see the altercation or shooting. Mr. Campbell also asked Mr. Conger, Jr., about any potential witnesses. Mr. Conger, Jr., mentioned that his sister was a bartender, but he said that she was inside the bar the entire time. Mr. Conger, Jr., noted that the victim had been asked to "go outside because of an incident, nothing violent, just some hurt feelings, maybe." Mr. Conger, Jr., did not give the names of any other witnesses.

Fred Holloway, another investigator with the public defender's office, testified that he spoke with Dr. Jordan regarding the blunt force trauma to Petitioner's eye. He noted that Dr. Jordan saw Petitioner on two occasions, in August of 2008 and in January of 2009. Mr. Holloway said:

> My only question of that was, if the incident at the Soul Train happened in May, then why was there such a time period before [Petitioner] was examined by the doctor, which I felt would not be very good to the case.

He noted that Dr. Jordan could not say what caused the injury other than it was from blunt force trauma.

Mr. Holloway testified that he spoke with Tangelia Alexander on April 13, 2009, and learned that she was at the Soul Train bar at the time of the shooting. She had gone to the bar with Petitioner. She said that Petitioner was not allowed in the bar, and she went inside and bought him a Sundrop. Mr. Holloway testified that Ms. Alexander told him:

> Then some man, who she didn't know, said, You need to check on [Petitioner]. About that time she got outside, apparently the shooting had already taken place.

> She heard [the victim] say, I am going to be okay. And then shortly after, she heard him say, "Take me to the hospital."
>
> She said she tried to find [Petitioner], but she never saw him. And then she tried calling him several times on his cell, but he never answered.
>
> Then she left by herself in the car. And she wasn't sure, but she thought the next day was when she finally heard from [Petitioner]. And according to her, he told her on the phone that he feared for his life, and that was the only way to get [the victim] off of him. But he never went into any details of what happened.

Mr. Holloway did not recall whether he questioned Ms. Alexander about a photograph of Petitioner that was transmitted by cell phone.

> Mr. Holloway testified that he also spoke with Ashton Davis. He said:
>
> She told me, on September 24th of '08, said that she was outside of the Soul Train in Lewisburg when a fight broke out between [Petitioner] and [the victim]. She wasn't a whole lot of help. She said she didn't know who started the fight, not did she know anything about [Petitioner] being hit with a bottle; . . .
>
> The next thing she knows, she heard some bullets being fired, and she ran to the door of the club, and that is all she knew.
>
> She did, however, tell me of another lady who I knew nothing about until I talked to her, and her name was Andrea Locke, who I also spoke with.

Mr. Holloway testified that he interviewed Ms. Locke who said that she was coming out of the Soul Train bar when Ms. Davis ran up to her and said that Petitioner had shot the victim. He noted that Ms. Locke did not see the fight or the shooting; however, she accompanied Ms. Davis to the police department where Ms. Davis gave a statement to police. Mr. Holloway testified that he was not given the names of any other witnesses.

## II. Standard of Review

On appeal, Petitioner asserts that the State (1) failed to disclose a statement made by the victim; (2) failed to disclose the statement of Ashton Davis; (3) failed to disclose the statement of Felice O'Neal; (4) failed to disclose the statement of Tangelia Alexander; and

(5) failed to disclose payment from the Criminal Injuries Compensation Fund. Petitioner argues that trial counsel and co-counsel rendered ineffective assistance of counsel by (1) failing to "investigate, interview, subpoena, and call to the stand" Shelby Harris, Darron Little, Alexander Harris, Jared Robinson, Zeldra Swaggerty, and Adriana Cross; (2) failing to request Jenck's material and cross-examine the victim concerning his statement to Detective Oliver; (3) failing to request a ballistics expert to testify at trial; and (4) failing to investigate and assert the defense of self-defense. Petitioner also argues that trial counsel was ineffective on direct appeal for failing to raise *Brady* issues. Petitioner also raises a procedural issue - he asserts that the trial court failed to address "each ground for relief as presented in the petition."

In a claim for post-conviction relief, the petitioner must show that his or her conviction or sentence is void or voidable because of the abridgment of a constitutional right. Tenn. Code Ann. § 40-30-103. Petitioner bears the burden of proving factual allegations by clear and convincing evidence. Tenn.Code Ann. § 40-30-110(f); *Grindstaff v. State*, 297 S.W.3d 208, 216 (Tenn. 2009). The post-conviction court's factual findings "are conclusive on appeal unless the evidence preponderates against those findings." *Jaco v. State*, 120 S.W.3d 828, 830 (Tenn. 2003). Upon review, this court will not reweigh or reevaluate the evidence below, and all questions concerning the credibility of witnesses, the weight and value to be given their testimony, and the factual issues raised by the evidence are to be resolved by the trial court, not this court. *Momon v. State*, 18 S.W.3d 152,156 (Tenn. 1999).

On appeal, the post-conviction court's findings of fact are entitled to substantial deference and are given the weight of a jury verdict. They are conclusive unless the evidence preponderates against them. *See Henley v. State*, 960 S.W.2d 572, 578 (Tenn. 1997); *Alley v. State*, 958 S.W.2d 138, 147 (Tenn. Crim. App. 1997). A post-conviction court's conclusions of law are subject to a *de novo* review with no presumption of correctness. *Fields v. State*, 40 S.W.3d 450, 457 (Tenn. 2001). Our supreme court has "determined that the issues of deficient performance by counsel and possible prejudice to the defense are mixed questions of law and fact, . . . thus, [appellate] review of [these issues] is de novo" with no presumption of correctness. *State v. Burns*, 6 S.W.3d 453, 461 (Tenn. 1999).

When a petitioner seeks post-conviction relief based on the alleged ineffective assistance of counsel, the petitioner bears the burden of showing that (a) the services rendered by trial counsel were deficient, and (b) that the deficient performance was prejudicial. *See Powers v. State*, 942 S.W.2d 551, 558 (Tenn. Crim. App. 1996). In order to demonstrate deficient performance, the petitioner must show that the services rendered or the advice given was below "the range of competence demanded of attorneys in criminal cases." *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975). In order to demonstrate prejudice, the petitioner must show that there is a reasonable probability that, but for

counsel's deficient performance, the result would have been different. *See Strickland v. Washington*, 466 U.S. 668, 694, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). "Because a petitioner must establish both prongs of the test to prevail on a claim of ineffective assistance of counsel, failure to prove either deficient performance or resulting prejudice provides a sufficient basis to deny relief on the claim." *Henley v. State*, 960 S.W.2d 572, 580 (Tenn. 1997).

On claims of ineffective assistance of counsel, the petitioner is not entitled to the benefit of hindsight. *See Adkins v. State*, 911 S.W.2d 334, 347 (Tenn. 1994). This Court may not second-guess a reasonably-based trial strategy, and we cannot grant relief based on a sound, but unsuccessful, tactical decision made during the course of the proceedings. *See id.* However, such deference to the tactical decisions of counsel applies only if counsel makes those decisions after adequate preparation for the case. *See Cooper v. State*, 847 S.W.2d 521, 528 (Tenn. Crim. App. 1992).

Initially, we address Petitioner's claim that the trial court did not address "each ground for relief presented in the petition." "Upon the final disposition of every petition, the court shall enter a final order, and . . . shall set forth in the order or a written memorandum of the case all grounds presented, and shall state the findings of fact and conclusions of law with regard to each such ground." Tenn. Code Ann. § 40-30-111(b); *see also* Tenn. Sup. Ct. R. 28 § 9(A). Petitioner contends that the trial court failed to address whether trial counsel and co-counsel failed to obtain "via motion" the victim's statement and that trial counsel did not effectively cross-examine the victim at trial. Although the trial court did not specifically address these issues in the manner raised by Petitioner, the trial court held that the victim's statement was exculpatory evidence "in that it could have been used to impeach the victim's testimony during cross examination." The trial court further accredited the prosecutor's testimony that the State provided the information to trial counsel and co-counsel.

Petitioner contends that the trial court failed to address trial counsel's failure to effectively cross-examine Ashton Davis. Although this issue was raised in the post-conviction petition, Petitioner did not specifically raise this issue on appeal. He mentioned Ms. Davis' testimony in an issue concerning trial counsel and co-counsel's failure to investigate and argue self-defense, an issue that was addressed by the trial court. Therefore, if there was any error in the trial court's failure to adequately address this issue, it was clearly harmless. Petitioner next argues that the trial court failed to address trial counsel and co-counsel's failure to "investigate, interview, subpoena, and call to the stand" Jared Robinson, Zeldra Swaggerty, and Adriana Cross. Although the trial court did not specifically mention these witnesses by name in the order denying the post-conviction petition, the trial court held:

Officer Amanda Newcomb testified that she left the police station when the 911 call of the shooting was received and drove the approximate distance on one block tot he crime scene. (TT. P. 65-67). Officer Newcomb further testified there were maybe ten to twelve people there who told her "I didn't see anything." In Officer Newcomb's words "Nobody would tell me anything." (TT. P. 67). Sergeant Anthony McLean's attempt to interview witnesses met with the same results as Officer Newcomb. (TT. P. 78). The court finds that the defendant has not proven by clear and convincing evidence that he received ineffective assistance of counsel by failing to discover witnesses. It is not the fault of the Public Defender's Office that these witnesses chose to remain anonymous and to "not get involved" until the post-conviction proceedings.

Later on the trial court addressed the credibility of the witnesses, who were called by post-conviction counsel at the post-conviction hearing but not questioned by post-conviction counsel about those statements. At the hearing, the statements were simply admitted as evidence by post-conviction counsel. Concerning this issue, the trial court specifically held:

It is not possible to accurately assess the credibility of witnesses called by the defendant at the post-conviction hearing as to what happened but introduced prepared written statements instead. This procedure denied the Court an opportunity to assess these witnesses' appearance and demeanor while testifying about the crux of the case.

Therefore, this issue was adequately addressed by the trial court.

Petitioner argues that trial court failed to address trial counsel and co-counsel's failure to "investigate, discover, and use information concerning the State's payment of money to Dejuan Oneal." Although the trial court did not specifically address trial counsel and co-counsel's failure to investigate, discover, and use the information, the trial court pointed out that the State did not violate *Brady* by not disclosing the information and noted that Petitioner could have obtained the information on his own. However, the Court also said that the payment from the Criminal Injuries Compensation Fund on behalf of the victim to cover his medical expenses was not "obviously exculpatory." The trial court agreed that the victim could have been "cross-examined about applying for criminal injuries compensation and thus it is exculpatory, it does not agree that the subject is obviously exculpatory. The court does not recall in its professional experience any cross over criminal injuries compensation." Therefore, the trial court adequately addressed this issue.

Petitioner next contends that the trial court did not address the following issues concerning appellate counsel: (1) failure to preserve and raise on appeal the State's failure to disclose the victim's statement; (2) failure to preserve and raise on appeal the State's failure to disclose the statement of Ashton Davis; (3) failure to preserve and raise on appeal the issue of the State's failure to disclose the statement of Felice O'Neal; (4) failure to preserve and raise on appeal the State's failure to disclose the statement of Tangelia Alexander; (5) failure to preserve and raise on appeal the State's failure to disclose a payment to the victim from the Criminal Injuries Compensation Fund; and (6) the cumulative effect of the deficient performance of appellate counsel.

However, these specific ineffective assistance of appellate counsel issues were not raised in the post-conviction petition or at the post-conviction hearing. We note that trial counsel also represented Petitioner on appeal. In Petitioner's amended post-conviction petition, he generally asserts that he was "deprived of the right of effective assistance of appellate counsel." More specifically, he states:

In the direct appeal of this case, trial counsel took on the role of appellate counsel. *State v. Tears*, No. M2009-01559-CCA-R3-CD, *1 (Tenn. Crim. App. Oct. 26, 2010). In this direct appeal, counsel raised only two issues: (1) that the evidence was insufficient to support Petitioner's convictions of attempted second degree murder and possession and employment of a firearm during the commission of a felony and (2) that the trial court erred in sentencing the Petitioner. *Id*.

The failure to raise any and all of the items in Issue I [ of the post-conviction petition] on direct appeal constituted deficient performance on the part of appellate counsel and prejudiced the fair disposition of Petitioner's case.

At the post-conviction hearing, the only testimony presented by Petitioner pertaining to appellate representation consisted of the following:

[Post-conviction Counsel]: After the trial, then you proceeded on appeal. Who represented you on appeal in this case?

[Petitioner]: The Public Defender's Office.

[Post-conviction Counsel]: Did they discuss with you the basis for the appeal?

| [Petitioner]: | No. We never talked any more after that because right after that, I never really even seen them much. They just sent me stuff in the mail. When they filed it, they sent me the paperwork, showing me that it was filed. When I got it, they sent me a brief, and that was it. |
|---|---|
| [Post-conviction Counsel]: | After the sentencing hearing in this case, did you meet with the Public Defender's office again during your appeal? |
| [Petitioner]: | No, sir. |
| [Post-conviction Counsel]: | Did you have any - - aside from them sending you stuff, sending you filings, did you have any correspondence between you two, communication? |
| [Petitioner]: | No, sir. |

Trial counsel testified that "appeals are strictly legal arguments, so it is up to the attorney to determine what the valid legal arguments would be, which in this case, it was sufficiency of the evidence and sentencing, and that was it. I didn't see any other issues." Trial counsel testified that Petitioner was kept informed on the appeal, and he was sent copies of the briefs and everything that was filed.

Petitioner did not present evidence at the post-conviction hearing pertaining to the precise alleged examples of ineffective assistance of appellate counsel. Consequently, there is no error by the trial court in not addressing those assertions in its ruling. Moreover, we note that in the trial court's order denying the post-conviction petition, the trial court did not find any *Brady* violations and held that the payment from the Criminal Injuries Compensation Fund was not exculpatory evidence.

Finally, Petitioner contends that the trial court erred in not addressing the "cumulative effect of the failures of the State, trial counsel, and appellate counsel." Again, any error by the trial court in not addressing this specific issue would be harmless. In its order denying post-conviction relief, the trial court did not find any violation of *Brady* by the State or that trial counsel's performance was deficient. Petitioner is not entitled to relief on this issue.

*Brady Violations*

-33-

Petitioner contends that the State knowingly withheld exculpatory evidence in violation of *Brady v. Maryland,* 373 U.S. 83, 87, 83 S.Ct. 1194, 1196-97, 10 L.Ed.2d 215 (1963). He contends that the State failed to disclose statements made by the victim, Ashton Davis, Felice O'Neal, and Tangelia Alexander. Petitioner further contends that the State failed to disclose that the victim was paid $20,000 from the Criminal Injuries Compensation Fund which covered medical expenses.

To prove a *Brady* violation, a defendant must demonstrate that 1) he requested the information (unless the evidence is obviously exculpatory, in which case the state is bound to release the information whether requested or not); 2) that the state suppressed the information; 3) that the information was favorable to the defendant; and 4) that the information was material. *Johnson v. State,* 38 S.W.3d 52, 56 (Tenn.2001). The evidence is deemed material if "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *United States v. Bagley,* 473 U.S. 667, 682, 105 S.Ct. 3375, 3383, 87 L.Ed.2d 481 (1985). A Brady claim in a post-conviction proceeding is "governed by the same prejudice standard as an ineffective assistance of counsel claim." *Cauthern v. State*, 145 S.W.3d 571, 599 (Tenn. Crim. App. 2004). "[A] defendant must show that there is a reasonable probability that the result of the proceedings would have been different." *Id*. at 598-99.

As to the statement of the victim, Dejuan O'Neal, the record shows that there was no *Brady* violation. Concerning this issue, the post-conviction court found as follows: "The court finds that the May 13ᵗʰ, 2008, statement that the victim, Gary DeJuan O'Neal gave to Detective Jimmy Oliver is exculpatory evidence in that it could have been used to impeach the victim's testimony during cross examination. The court further accredits General Barnard's testimony and finds that he did, in fact, provide this information to defense counsel."

Although the post-conviction court found the victim's statement to be exculpatory, there is no showing that the State suppressed the evidence. Trial counsel was familiar with a statement by the victim that was later reproduced in the presentence report in its entirety. When asked if he was familiar with the statement before trial, trial counsel testified that he was familiar with what was going on because he had spoken to the State numerous times informally and also to Detective Oliver. Trial counsel indicated that the prosecutor told him that Detective Oliver had gone to the hospital to talk to the victim while the victim was still under the effects of medication. The victim also talked with the State a couple of days after he was released from the hospital. Trial counsel said that the content of the statement did not "throw [him] for a loop or anything like that." He said that it was not unusual for him to be given open file discovery from the district attorney general's office in a case. Therefore, he was already acquainted with the statement when it came out in the presentence report.

On cross-examination, trial counsel testified that he knew what the victim was going to say from talking to Detective Oliver and the prosecutor about the case. There had also been a preliminary hearing. Trial counsel testified that he found out what the victim had said through "informal discovery." He noted that the victim had given two different statements. "One was when he was under the effects of the medication. Then he gave another one, which placed him closer to the car." Trial counsel testified that he first saw the statement by the victim which read, "We were scuffling up against a car, and I heard like a pow noise and I let off of [Petitioner]," printed in the presentence report. However, he was "generally" told about the statement. Trial counsel acknowledged that at trial, the victim testified that when he was shot, he had already let go of Petitioner and had stepped back from Petitioner.

The prosecutor testified that when it came time for discovery, he did not feel that the statement was exculpatory. However, he felt that if the case went to trial, "hay" could be made out of the statement. The prosecutor testified:

> I answered discovery. We discussed the case. We made an offer. And once I saw that an offer was not going to be accepted in this case, but before it was set for trial, my memory of this is that I spoke with representatives of the Public Defender's Office.
>
> I showed them this statement. I explained the conversation that was had in my office with the witness, [the victim], and explained to them, if they used it - - and I am not talking about in a threatening way. I didn't explain it to them in a threatening way. I just explained to them what the explanation was going to be.
>
> To my memory, they seemed to understand that.
>
> The reason I was explaining the explanation to them, I didn't want to set them up by handing them a statement and not giving any explanation because I don't do the Public Defender's office that way.
>
> And that is basically it about that. It is my memory that they did see the statement. They did read the statement. And I gave them the explanation of the meeting that would have taken place.

The post-conviction court accredited the prosecutor's testimony that he showed the victim's statement to trial counsel and co-counsel. Furthermore, trial counsel admitted that he was familiar with the contents of the statement and it did not surprise him. "No *Brady* violation exits where a defendant knew or should have known the essential facts permitting

-35-

him to take advantage of any exculpatory information, or where the evidence is available from another source." *Byrd v. Collins*, 209 F.3d 486, 517 (6th Cir. 2000)(citations omitted).

Next, Petitioner contends that the State violated *Brady* by failing to disclose a statement by Ashton Davis to police. Concerning this issue, the post-conviction court found:

> The court finds that Ashton Davis' statement to Detective Jimmy Oliver is exculpatory. The court also finds that the failure to provide her statement to the Public Defender's Office does not put the whole case in such a different light as to undermine the confidence of the verdict.
>
> In order to establish that exculpatory evidence is "material," a defendant must show that "the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine the confidence in the verdict." Kyles v. Whitley, 514 U.S. 419, 435 (1995); see also Edgin, 902 S.W.2d at 390. There must be a "reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." Edgin, 902 S.W.2d at 390 (quoting Kyles, 514 U.S. at 435).
>
> The defendant acknowledges in his Additional Grounds (for post-conviction relief) Introduction, page 3: "Ashton Davis testified at trial to essentially the same information she gave Detective Oliver the day of the shooting."
>
> On May 11, 2008, the date of the shooting, Ashton Davis gave Detective Jimmy Oliver the following relevant statement: "Dejuane [Mr. O'Neal] had John John [Mr. Tears] up against John John's car and was hitting him then I saw John John pull a black pistol from his right side and I heard 2 or 3 shots." She in relevant part at trial testified that the victim was on top of Mr. Tears when Mr. Tears pulled the gun out and shot the victim.
>
> Barnard: . . . so they were both passing blows?
>
> Davis: Yes.
>
> Barnard: Both of the men?
>
> Davis: Yes.
>
> Barnard: Okay. Then after the fight stopped, or was the fight still going on, or do you know?

Davis: It was still going on.

On cross, [trial counsel] elicited more detail from Ashton Davis.

Q: And [Petitioner] pulled out his gun while the fight was going on?

A: Yes.

Q: What happened?

A: I heard gunshots, and I left.

Q: So when [the victim] is sitting there punching [Petitioner], [Petitioner] then pulled out the gun while [the victim] was still on him?

A: Yes.

Q: You saw this?

A: Yes.

Q: Before the gun went off, did you ever see [the victim] try to back off at all?

A: No.

Q: Did you ever see [Petitioner] laying on a car?

A: Yes.

Q: Was that while [the victim] was punching him?

A: Yes.

Q: At any point, did it look like [Petitioner] was not able to fight back.

A: At some point, yes.

Q: At some point, he wasn't able to fight back?

A: Yes.

Q: Then after that, [Petitioner] pulled out the gun?

A: Yes.

[trial counsel]: No further questions, Your Honor.

For the same reasons the court does not find that the failure to request Jencks material after her testimony affected the outcome of the trial.

The record does not preponderate against the trial court's findings. Concerning Ashton Davis, trial counsel testified: "Ashton Davis was not forthcoming with us. The information she told us was not consistent with that she said at trial." However, when called as a witness, Ms. Davis' testimony "helped us quite a bit." Petitioner has not demonstrated any prejudice by the State's alleged failure to provide information on Ms. Davis' statement to police. Petitioner has not shown that there was a "reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *State v. Edgin*, 902 S.W.2d 387, 390 (quoting *Kyles v. Whitley*, 514 U.S. 419, 435).

Petitioner next contends that the State violated *Brady* by failing to disclose statements to police by Felice O'Neal and Tangelia Alexander. Concerning this issue, the post-conviction court found:

The defendant's pleading contends that Ms. Felice Danielle O'Neal's statement indicated that she made photographs of injuries the defendant sustained before shooting the victim but the relevant passage from her statement is actually "He sent me a picture of his eye where (sic) Dejuan had hit him through the cell phone." Exhibit 15. Since she did not testify at the post-conviction hearing and no such photographs were introduced, the defendant failed to meet his burden of proof regarding this allegation. Furthermore, at trial the Public Defender's Office called optometrist, Jeffrey Jordan, who testified that he agreed with the history of blunt trauma provided him by the defendant and that this most likely caused his floaters and syneresis, TT. P. 227. More importantly, it was clear at trial that the defendant was bleeding because his blood marked the route he took as he fled the scene after he shot the victim, TT p. 168-171; p. 193-195. She also said in her statement ". . . he kept saying he was sorry for what he did to Dejuan.["]

Based on the foregoing analysis, the court does not find ineffective assistance of counsel in the failure to call Felice Danielle O'Neal as a defense witness.

The court further finds that since Ms. Felice O'Neal did not testify at trial, the Public Defender's Office did not have an opportunity to request Jencks material regarding her testimony

In their statements to police both Ms. O'Neal and Ms. Alexander said that they were inside the Soul Train Bar when the shooting occurred. Ms. Alexander said that she went to the bar with Petitioner; however, he was not allowed inside. She said that she spoke with Petitioner after the shooting, and he told her that he and the victim had gotten into a fight and "that he tried to avoid it but he [the victim] kept coming after him and he [the victim] was beating him up pretty bad and he had to do what he had to do to get him off him." Ms. Alexander told Detective Oliver that Petitioner sent her pictures of "his face where [the victim] had beat him up and his eye was swollen shut and he had a cut on it." Ms. Alexander further said that she had talked to Petitioner several times but had not seen him. She also said that they had not talked about what happened at the bar.

Ms. O'Neal told Detective Oliver that she and Petitioner had two children together. She was inside the bar when the shooting occurred. Ms. O'Neal told Detective Oliver that Petitioner later called her. She said:

I talked to [Petitioner] on the phone and asked him what happened and he said [the victim] walked up on him wanting to fight and [Petitioner] told him he was too f[- -]cked up to fight and he wasn't going to fight that he would talk to him in the morning. He said [the victim] wouldn't take no for an answer and [the victim] hit him with a beer bottle across the face and [the victim] had him in a head lock hitting him in the eye. [Petitioner] said he pulled the gun out and shot him to get him off of him.

Ms. O'Neal testified that Petitioner also sent her a picture by cell phone of his eye where he said that the victim hit him. She said that Petitioner asked about the victim and indicated that he was sorry for what he had done to the victim.

Petitioner has not demonstrated that the State suppressed this evidence nor has he shown that it was material to the case or that he was prejudiced by any alleged failure to disclose the statements. Neither Ms. O'Neal nor Ms. Alexander testified at trial. Concerning the two statements, trial counsel testified that he was "pretty certain" that the investigators spoke with Ms. Alexander and that she did not "really know anything about the incident" because she did not see it happen. He also noted that Ms. O'Neal, Petitioner's girlfriend or ex-girlfriend did not see anything either because she was inside the bar. Trial counsel testified that the two statements referred to communications that occurred after the shooting. He also noted that in Ms. O'Neal's statement, there was a picture of Petitioner's eye that was

retrieved from her cell phone. Trial counsel testified that the information was provided in discovery.

Trial counsel further testified that they could not use the statements "because anything that was told to Tangelia Alexander was hearsay because she didn't actually see what happened." He acknowledged that she spoke with Petitioner after the fact, but she had no "firsthand knowledge." Trial counsel felt that Ms. O'Neal's statement was also hearsay, and he said: "They only thing pertinent that she provided was the picture of [Petitioner's] eye."

Investigator Fred Holloway testified that he spoke with Ms. Alexander and learned that she had accompanied Petitioner to the Soul Train bar on the night of the shooting. She told Mr. Holloway that Petitioner was not allowed inside the bar and that she went inside and purchased him a Sundrop. Ms. Alexander told Mr. Holloway that when she got outside the shooting had already occurred. She then left the bar alone and spoke with Petitioner the following day. Ms. Alexander told Mr. Holloway that Petitioner told her that he feared for his life, and "that was the only way to get [the victim] off of him." She said that Petitioner did not go into any details about what happened. Petitioner is not entitled to relief on this claim.

Finally, Petitioner alleges that the State violated *Brady* by failing to disclose that the victim received a $20,000 payment from the Criminal Injuries Compensation Fund. Concerning this issue, the trial court held:

> The court does not find that the monetary award from the criminal injuries compensation fund to pay the victim's medical expenses to be obviously exculpatory. While the court agrees with the defendant that a victim could be cross-examined about applying for criminal injuries compensation and thus is exculpatory, it does not agree that the subject is obviously exculpatory. The court does not recall in its professional experience any cross[-examination] over criminal injuries compensation. Further, there is no proof that the defendant's trial counsel requested this information or that the State suppressed it.

> The "prosecution is not required to disclose information that the accused already possesses or is able to obtain." State v. Marshall, 845 S.W.[2d] 228, 233 (Tenn. Crim. App. 1992). The record does not show that the defendant was unable to obtain this information on its own.

> The court accredits General Barnard's testimony that he was unaware of the victim's claim. Applying T.P.I. 108, that the finder of fact "should consider all of the evidence in light of you own observations and experiences in life", the

-40-

court notes that its prior experience as a prosecutor coincides with General Barnard's testimony in that in the 17th Judicial District, assistant district attorneys were very rarely consulted by the District Attorney for input as to approving or denying a criminal injuries compensation claim. The court finds that the defendant received a fair trial after considering all the defendant's alleged Brady violation, Kyles, 514 U.S. at 434.

The record does not show that the State suppressed this information nor that it was material to Petitioner's case. Trial counsel testified that the victim was awarded $20,000 from the Criminal Injuries Compensation Fund to cover some of his medical bills, and the payment was a nonissue to him. Trial counsel said that he knew the money was going toward the victim's medical bills. He said:

> People that are victims of crimes get money from the compensation fund. That money is going to go to pay hospital bills. In my opinion, it would be unethical for me to try to paint it as he is being bribed by the State because that it not what it is.

Trial counsel thought that the money went to pay bills from Vanderbilt Medical Center. He did not believe that payment of the money would go to the credibility of the witness. Trial counsel testified:

> Now, if it was $20,000 in cash that was going into [the victim's] pocket, then I could see that being compounding a crime, which is a crime itself, but that is not what is going on here. That is going to pay medical bills.

Assistant Attorney General Weakley Barnard testified that the $20,000 paid from the Criminal Injuries Compensation Fund was not exculpatory, and it all went to Vanderbilt Medical Center for the payment of medical bills rather than to the victim. Mr. Barnard testified that the assistant district attorneys general never know anything about payments from the Criminal Injuries Compensation Fund. He said:

> It goes directly to our victim witness coordinator. She handles all of the paperwork. It is handled out of the Marshall County office, but it is something I am basically unaware of.

> The district attorney, not an assistant, but the district attorney has to sign off on the request.

Maybe in the 20 something years I have been down here since the Victim's Compensation Act has been going, I may have been asked about a case twice by the district attorney before he signed. I was not asked about this case. So I had no idea that any moneys had been given or anything else. So I was unaware of it.

Mr. Barnard testified that since he had no knowledge that a payment was made from the Criminal Injuries Compensation Fund, he did not use it as "some kind of hold over people, to say, you know, if you don't help us, we are going to get that money back." Mr. Barnard did not feel that the money paid on the victim's debt affected his credibility.

Petitioner had not shown that there is a reasonable probability that the result of his proceedings would have been different if the jury had known about the payment from the Criminal Injuries Compensation Fund. Petitioner is not entitled to relief on this issue.

*Ineffective Assistance of Trial Counsel*

First, Petitioner contends that trial counsel and co-counsel were ineffective for failing to request *Jencks* material concerning the victim's statement to Detective Oliver and to use that statement to cross-examine and impeach the victim's testimony at trial. We agree. Initially, we point out that the State did not address this issue in its brief. Furthermore, in a reply brief, Petitioner pointed out the State's failure to address this issue. Even after the omission was pointed out in the reply brief, the State did not move to amend its brief or to file a supplemental brief. Therefore, no argument in opposition to Petitioner's assertions on this issue has been presented to this Court by the State.

Trial counsel testified that he was aware of the victim's statement prior to trial, and he knew that the victim had indicated that the fight was still going on when Petitioner shot him. In his statement to Detective Oliver, the victim said:

On 5/11/08 I was at Soul Train Bar and Grill with my girlfriend Taquia Johnson. I had been drinking and I remember going outside and me and [Petitioner] had words but I can't remember why because I had been drinking. The next thing I know we were scuffling up against a car and I heard like a pow noise and I let off of [Petitioner] and grabbed my throat and there was a crowd of people yelling for me to get down and I remember taking my shirt off and going to the ground. After that I remember feeling my mothers breath on me and her saying you've been shot and saying I was going to be o.k. and her and Taquia put me in Taquia's car and they took me to the E.R. The next thing I remember I woke up and they told me I was in Vanderbilt.

-42-

The prosecutor noted that the victim was sedated at the hospital when he gave the statement to Detective Oliver. He said that a few days after the victim was released from the hospital, the victim and his mother arrived at the prosecutor's office unannounced and indicated that the victim had concerns about his statement to Detective Oliver. He pointed out that he was under sedation and "really didn't know what he told Detective Oliver." The victim did not deny that he had been drinking or that he went outside and had words with Petitioner. The prosecutor testified that the victim indicated that the statement was incorrect where the victim said that he could not recall what happened because he had been drinking. The victim said that he did remember what happened. The victim clarified that he had backed up before the shooting and had already let go of Petitioner when he was shot.

At trial, the victim testified that he and Petitioner were fighting, and he hit Petitioner in the "head area" several times with his fist. The victim testified that he then let Petitioner go, and Petitioner stepped back, reached for a gun, cocked it, and shot the victim. The victim further testified that he had "backed off" Petitioner before Petitioner shot him.

Trial counsel admitted that he was familiar prior to trial with the contents of the victim's statement to Detective Oliver. The prosecutor also testified that he had shown a copy of the statement to trial counsel and co-counsel. We find that the statement could have been used on cross-examination to impeach the credibility of the victim whose testimony belied Petitioner's claim of self-defense. The information in the victim's initial statement also matched the testimony of Ashton Davis who testified that the victim was still on top of Petitioner and hitting him when Petitioner pulled the gun out and shot the victim. We further point out that on direct appeal, a panel of this court held that the evidence was sufficient to support Petitioner's conviction for attempted second degree murder. In considering the issue, this court stated in part:

> Viewing the evidence in the light most favorable to the State, the trial evidence indicates that the Defendant initiated a physical altercation with the victim. The evidence also indicated that the victim, who was unarmed, was winning the fight and inflicting injuries upon the Defendant. However, the victim had stepped back and let the Defendant go when the Defendant looked at the victim and then shot him in the neck.

Importantly, the post-conviction court specifically stated that the statement that the victim gave to Detective Oliver was exculpatory evidence in that it could have been used to impeach the victim's testimony during cross-examination. This statement could have raised questions in the minds of the jurors concerning the victim's credibility, specifically as to whether Petitioner shot the victim in self-defense. We find that Petitioner has demonstrated that there was a reasonable probability that absent the deficiency of trial counsel and co-

-43-

counsel concerning this issue, the outcome of the trial would have been different. Therefore, we reverse the judgment of the trial court denying post-conviction relief, vacate Petitioner's conviction for attempted second degree murder and employing a handgun during the commission of a dangerous felony and remand this cause for a new trial.

Next, Petitioner contends that trial counsel and co-counsel were ineffective for failing to discover that the victim had received $20,000 from the Criminal Injuries Compensation Fund. We disagree. As previously discussed, trial counsel testified that he considered the payment a nonissue because the money went to pay the victim's medical bills. He did not believe that payment of the money would go to the credibility of the witness. Trial counsel noted that if the $20,000 was in cash paid directly to the victim, then he "could see that being compounding a crime, which is a crime itself, but that is not what is going on here." The prosecutor did not feel that the $20,000 paid from the Criminal Injuries Compensation Fund was exculpatory. He further did not feel that the money paid on the victim's debt affected his credibility.

Even if trial counsel and co-counsel's performance in this area was deficient, Petitioner has not demonstrated any prejudice. There is absolutely no showing that the failure to discover and disclose to the jury that the victim received payment from the Criminal Injuries Compensation Fund to cover his medical expenses affected the outcome of the trial. Petitioner is not entitled to relief on this issue.

Third, Petitioner argues that trial counsel and co-counsel were ineffective for failing to "[i]nvestigate, interview, subpoena, and call to the stand the following necessary witnesses: Shelby Harris, Darron Little, Alexander Harris, Jarrod Robinson, Zeldra Swaggerty, and Adriana Cross." We disagree.

Concerning this issue, the post-conviction court found:

The defendant complains that the Pubic Defender's Office failed to investigate, interview and/or call Darren L[i]ttle as a witness at trial. Darren L[i]ttle acknowledged a prior record for five or six felonies including aggravated assault. He said he'd had "a lot of Bud Light to drink that night" and that he'd done some coke inside the club with Shelby Harris and the victim before the shooting. As the post-conviction hearing L[i]ttle testified that he was inside the club when he heard the shot, and that he was inside when the police arrived. He said he went home without speaking to the police because he had no reason to speak to them. He testified that he saw the defendant's eye swollen shut which the court does not find credible because the defendant fled immediately after shooting the victim and went to Memphis. If Darren L[i]ttle was inside

-44-

the club at the time of the shooting and also inside when police were there and the defendant fled immediately, as by all accounts he did, then L[i]ttle would have had no opportunity to observe the defendant after the shooting.

Officer Amanda Newcomb testified that she left the police station when the 911 call of the shooting was received and drove the approximate distance of one block to the crime scene. (TT.P. 65-67). Officer Newcomb further testified there were maybe ten to twelve people there who told her "I didn't see anything." In Officer Newcomb's words, "Nobody would tell me anything." (TT.P. 67). Sergeant Anthony McLean's attempt to interview witnesses met with the same results as Officer Newcomb. (TT.P. 78). The court finds that the defendant has not proven by clear and convincing evidence that he received ineffective assistance of counsel by failing to discover witnesses. It is not the fault of the Public Defender's Office that these witnesses chose to remain anonymous and to "not get involved" until the post-conviction proceedings. For instance, Alex Harris , who acknowledged a prior record of three felony drug sales, testified at the post-conviction hearing that after he saw the defendant run he ran away as well. He added that it was "not my place to tell anybody" and "I wouldn't have told them anything."

The court accredits [trial counsel's] testimony that at the close of the State's case he made a strategy [sic] decision not to call Alex Harris [Shelby Harris] because he felt the State's case did not refute self-defense. Also, [trial counsel] logically deduced that calling numerous witnesses who were both convicted felons and friends with the defendant might bias the jury against the defendant's claim of self-defense.

As for Shelby Harris, trial counsel testified that he saw Mr. Harris' name on the State's witness list, but Petitioner did not say anything about Mr. Harris. He noted that he would have never told Petitioner that since Mr. Harris was listed as the State's witness, they could not call him to testify. However, trial counsel said: "At that point in trial, I definitely did not want to call Shelby Harris because I would not have known what Mr. Harris was going to say."

On cross-examination, trial counsel did not recall Petitioner giving him a phone number for Mr. Harris. He first became aware that Mr. Harris was a potential witness when he received discovery. Concerning efforts to contact Mr. Harris, trial counsel testified:

I don't recall specifically what efforts we went through. I assume that the investigators - - I probably told the investigators to look for him. But

-45-

[Petitioner] never really focused on Shelby Harris at all. He focused on Andrea Locke, Tangelia Alexander, Ms. O'Neal, but not even her so much as those two, plus Ashton Davis. Those were really the three that he focused on: Davis, Alexander and Andrea Locke, and Conger, Sorry.

Trial counsel also noted that if Petitioner had told him that Mr. Harris was outside and witnessed the fight, they would have tried to "track him down." Trial counsel knew that Mr. Harris was present during trial, and when it became obvious that the State was not going to call Mr. Harris as a witness, trial counsel testified that he and Petitioner may have had a conversation about calling Mr. Harris to testify. However, trial counsel reiterated that he "was not going to call a witness that [he] didn't know what he was going to say when things were going pretty well, based upon Ashton Davis' testimony; and also on [the victim's] testimony about admitting to being highly intoxicated and also saying that they had problems in the past. That was really a gamble."

Although Mr. Harris testified at the post-conviction hearing that he saw Petitioner shoot the victim while the victim was still beating Petitioner, he had previously told police that he was inside the bar and did not see the fight or the shooting. He also admitted that he did not talk to police immediately after the shooting.

We conclude that trial counsel and co-counsel made a sound, strategic decision not to call Mr. Harris as a witness at trial. As noted above, this Court may not second-guess a reasonably-based trial strategy, and we cannot grant relief based on a sound, but unsuccessful, tactical decision made during the course of the proceedings. *Adkins v. State*, 911 S.W.2d 334, 347 (Tenn. 1994).

Concerning Darron Little, Alexander Harris, Jared Robinson, Zeldra Swaggerty, and Adriana Cross, trial counsel testified that Petitioner never provided any of their names as potential witnesses. Trial counsel also did not recall Petitioner's family contacting him with information about any witnesses in the case. Trial counsel testified that if Alexander Harris had told them that he saw the victim consume cocaine immediately before Petitioner approached the victim and attacked him, it might have helped Petitioner's case. However, trial counsel noted that he and co-counsel were also representing Mr. Harris at the time on unrelated charges, and he did not come forward with any information. Trial counsel specifically testified: "I didn't know Alexander Harris knew anything about this."

Co-counsel also testified that Petitioner did not give the names of Mr. Little, Mr. Harris, Mr. Robinson, Ms. Swaggerty, or Ms. Cross as potential witnesses. He said that Petitioner did not give them any names, and no one contacted the public defender's office indicating that they had any information. Co-counsel testified that the public defender's office

did not have the resources to "conduct a door-to-door canvassing of a neighborhood, looking for people that might know information about something." Co-counsel testified that he and trial counsel asked the investigators to try and locate witnesses on the State's witness list and speak to them. He said that they spoke with some of the witnesses, which probably would have been mostly law enforcement officers.

The Public Defender testified that it was believed that there were several witnesses to the shooting at the Soul Train Bar; however, it was her experience that most witnesses do not want to get involved or come forward. She further noted that it was sometimes impossible to get witnesses to testify, and she could not "make them testify as to what I think they truly saw. . ." The Public Defender testified that her office did not have the resources to "go out into the City of Lewisburg or Marshall County and do a canvas of, hey, did you happen to be at the Soul Train this date." She noted that the best way to find witnesses would have been for Petitioner to have given them names. She said, "Then other witnesses that we do [sic] may find, we hope that they will tell us witnesses. I mean, it's sort of like a domino effect. In this case, we did not have this."

We do not find that trial counsel or co-counsel's performance in this area was deficient. Mr. Little, Mr. Harris, Mr. Robinson, Ms. Swaggerty, and Ms. Cross all admitted at the post-conviction hearing that they did not tell anyone what they knew about the shooting. Mr. Robinson testified that he left the scene after the shooting and did not want to get involved in anything. Ms. Swaggerty and Ms. Cross both testified that they went to the hospital after the shooting and saw police there, but they did not tell them that they saw anything. Ms. Cross testified that even after learning that Petitioner had been arrested, she did not contact law enforcement because it was not "her place" to do so. Mr. Little admitted at the post-conviction hearing that he did not tell police anything when they arrived at the bar and that he went home. Mr. Harris testified at the post-conviction hearing that even if he had been contacted by someone from the public defender's office about the shooting, he would not have told them anything. He indicated that he was only worried about himself at that point and that he did not feel it was his "place" to tell police what he saw because it did not "involve" him.

The record does not preponderate against the trial court's finding that Petitioner failed to prove ineffective assistance counsel on this ground by clear and convincing evidence. Petitioner is not entitled to relief on this issue.

Petitioner contends that trial counsel and co-counsel were ineffective for failing to call a ballistics expert at trial to determine the "physical location and position" of the victim and Petitioner during the shooting. However, to succeed on a claim of ineffective assistance of counsel for failure to call a witness at trial, a petitioner should present that witness at the post-conviction hearing. *Pylant v. State*, 263 S.W.3d 856, 869 (Tenn. 2008). "As a general rule,

this is the only way the petitioner can establish that . . . the failure to have a known witness present or call the witness to the stand resulted in the denial of critical evidence which inured to the prejudice of the petitioner." *Id*. (*quoting Black v. State*, 794 S.W.2d 752, 757 (Tenn. Crim. App. 1990)). Petitioner did not call a ballistics expert to testify at the post-conviction hearing. Therefore, he is not entitled to relief on this issue.

Finally, Petitioner argues that trial counsel and co-counsel were ineffective for investigate and assert self-defense. More specifically, he contends that on cross-examination of Ashton Davis, trial counsel failed to ask her if she believed that Petitioner shot the victim in self-defense. Concerning the self-defense issue, the trial court found as follows:

> The defendant's conclusion that by giving the self-defense instruction, the court found the victim to be the first aggressor is not accurate. Certainly the evidence at trial merited a self-defense instruction. This instruction is multi-faceted and requires the finder of fact to consider the totality of the circumstances. In the court's opinion, the victim showed poor judgment in initially approaching the defendant but his actions and words did not merit the defendant hitting the victim in the face. While this is a close case, the court concludes that this blow by the defendant provoked the victim's use of unlawful force.

> The [threat] or use of force against the deceased or alleged victim would not have been justified if the defendant provoked the deceased's or alleged victim's use or attempted used of unlawful force, unless the defendant abandoned the encounter or clearly communicated to the deceased or alleged victim the intent to do so, and the deceased or alleged victim nevertheless continued or attempted to use unlawful force against the defendant.

> If a defendant was not engaged in unlawful activity and was in a place where he or she had a right to be, he or she would have no duty to retreat before threatening or using force against the deceased or alleged victim when and to the degree the defendant reasonably believed the force was immediately necessary to protect against the alleged victim's use or attempted use of unlawful force. T.P.I. 40.06(b).

> Thus, the jury could have reasonably rejected self-defense because the defendant was engaged in unlawful activity; to wit: carrying a weapon for the purpose of going armed. Had Mr. Conger, Sr. or Mr. Conger, Jr. testified the jury would have learned that the defendant was banned from Soul Train for his behavior the night before. The jury might then have concluded that self-

defense did not apply because the defendant was in a place, Soul Train, where he had no right to be.

Also, the jury could have decided that the defendant's use of a deadly weapon was not immediately necessary to protect against the victim's use of unlawful force as the victim was unarmed and the defendant['s] shot was perfectly aimed to kill.

Collective Exhibit Four shows that the Public Defender's Office did, in fact, argue self-defense. Perhaps, they were not as verbose as some attorneys but sometimes less is more. This is a matter of style not substance. Just as there are many genres of music; classical, rock, jazz, country, etc., there are many approaches a[n] attorney can use in handling a case. The court also does not find them ineffective for arguing for a lesser included offense in addition to self-defense. While some attorneys feel that it is necessary to pursue only a single theory of defense there is no consensus of opinion. The court certainly does not find that it is ineffective assistance of counsel to pursue divergent avenues of defense particularly in this case, the facts of which raise both alternatives in defending the case.

Trial counsel testified that all he argued at trial was self-defense in both opening and closing statements, and through his examination of witnesses tried to establish self-defense. He pointed out that, as noted in the order denying post-conviction relief, that a self-defense instruction was also given by the trial court. Co-counsel testified that he and trial counsel spent a substantial amount of time preparing for Petitioner's case. The focus of the defense was self-defense, which he and trial counsel discussed. The Public Defender testified that she was aware of Petitioner's case and participated in discussions with trial counsel and co-counsel about the case. She testified that they discussed self-defense issues. The Public Defender testified: "Frankly, it was pretty much the only defense that we could go on, but it was a weak defense, at best. There were problems with it, one being the mere fact that [Petitioner] - - the information we had was that he was not supposed to be there."

Petitioner has not demonstrated that there was a complete lack of investigation and failure to assert self-defense by trial counsel and co-counsel. Even though trial counsel did not specifically ask Ashton Davis on cross-examination if she believed Petitioner was acting in self-defense when he shot the victim, the Petitioner acknowledges that her testimony "implicated self-defense." Trial counsel testified that when called as a witness, Ms. Davis' testimony "helped us quite a bit." As pointed out by the State: "Cross-examination is a strategic and tactical decision . . . which is not to be measured by hindsight." *State v. Kerley*,

820 S.W.2d 753, 756 (Tenn. Crim. App. 1991).  Petitioner is not entitled to relief on this issue.

Petitioner contends that the "cumulative effect of the deficient performance of trial counsel abridged the constitutional rights of appellant."  Under the cumulative error doctrine "multiple errors committed in the trial proceedings, each of which in isolation constitutes mere harmless error, but which when aggregated have a cumulative effect on the proceedings so great as to require a reversal in order to preserve a defendant's right to a fair trial."  *State v. Hester*, 324 S.W.3d 1, 76-77 (Tenn. 2010)(internal citations omitted).  "To warrant assessment under the cumulative error doctrine, there must have been more than one actual error committed in the trial proceedings."  *Id.* (internal citations omitted).

In this case, we have granted relief on the only issue requiring reversal.  Petitioner is not entitled to relief on any other issue that he raises in the post-conviction petition.

*Ineffective Assistance of Appellate Counsel*

Petitioner contends that appellate counsel rendered deficient performance by failing to raise *Brady* claims on appeal.  The principles for determining the effectiveness of counsel at trial and on appeal are the same in a post-conviction proceeding.  *See Campbell v. State,* 904 S.W.2d 594, 596 (Tenn. 1995).  A petitioner alleging ineffective assistance of appellate counsel must prove both that 1) appellate counsel was objectively unreasonable in failing to raise a particular issue on appeal, and 2) absent counsel's deficient performance, there was a reasonable probability that the petitioner's appeal would have been successful before the state's highest court.  *See Smith v. Robbins,* 528 U.S. 259, 285 (2000).  In *Carpenter v. State*, 126 S.W.3d 879 (Tenn. 2004), our supreme court stated the following regarding review of allegations of ineffective assistance by appellate counsel.

> Appellate counsel are not constitutionally required to raise every conceivable issue on appeal.  *King v. State,* 989 S.W.2d 319, 334 (Tenn. 1999); *Campbell v. State,* 904 S.W.2d 594, 596-97 (Tenn. 1995).  Indeed, "experienced advocates have long 'emphasized the importance of winnowing out weaker arguments on appeal and focusing on one central issue if possible, or at most a few key issues.'"  *Cooper v. State,* 849 S.W.2d 744, 747 (Tenn. 1993) (quoting *Jones v. Barnes,* 463 U.S. 745, 751, 103 S.Ct. 3308, 77 L.Ed.2d 987 (1983)); *see also Smith v. Robbins,* 528 U.S. 259, 288, 120 S.Ct. 746, 145 L.Ed.2d 756 (2000).  The determination of which issues to raise on appeal is generally within appellate counsel's sound discretion.  *Jones,* 463 U.S. at 751, 103 S.Ct. 3308; *King,* 989 S.W.2d at 334; *Cooper,* 849 S.W.2d at 747.  Therefore, appellate counsel's

professional judgment with regard to which issues will best serve the appellant on appeal should be given considerable deference. *See Campbell,* 904 S.W.2d at 597; *see also Strickland,* 466 U.S. at 689, 104 S.Ct. 2052. We should not second-guess such decisions, and every effort must be made to eliminate the distorting effects of hindsight. *See Campbell,* 904 S.W.2d at 597; *see also Strickland,* 466 U.S. at 689, 104 S.Ct. 2052; *Hellard v. State,* 629 S.W.2d 4, 9 (Tenn. 1982). Deference to counsel's tactical choices, however, applies only if such choices are within the range of competence required of attorneys in criminal cases. *Campbell,* 904 S.W.2d at 597.

If a claim of ineffective assistance of counsel is based on the failure to raise a particular issue, as it is in this case, then the reviewing court must determine the merits of the issue. *See, e.g., Kimmelman v. Morrison,* 477 U.S. 365, 375, 106 S.Ct. 2574, 91 L.Ed.2d 305 (1986). Obviously, if an issue has no merit or is weak, then appellate counsel's performance will not be deficient if counsel fails to raise it. Likewise, unless the omitted issue has some merit, the petitioner suffers no prejudice from appellate counsel's failure to raise the issue on appeal. When an omitted issue is without merit, the petitioner cannot prevail on an ineffective assistance of counsel claim. *See United States v. Dixon,* 1 F.3d 1080, 1083 (10th Cir. 1993).

*Carpenter*, 126 S.W.3d at 887.

Trial counsel, who also represented Petitioner on appeal, testified that he raised sufficiency of the evidence and sentencing. He said, "I didn't see any other issues." No further evidence was elicited from trial counsel as to why he did not raise other evidentiary issues on appeal.

As quoted from *Carpenter,* "If a claim of ineffective assistance of counsel is based on the failure to raise a particular issue, as it is in this case, *then the reviewing court must determine the merits of the issue. See,* e.g., *Kimmelman v. Morrison,* 477 U.S. 365[ ] (1986)." *Carpenter,* 126 S.W.3d at 887 (emphasis added).

In order for the reviewing court to determine the merits of the omitted issue, a petitioner should present the previously omitted issue in the same form and with the same legal argument(s), that is, applying law to the facts of the case, which petitioner asserts appellate counsel should have done. It is not enough to simply state that appellate counsel should have raised certain issues on appeal and to argue that these issues could have resulted in relief being granted to the petitioner. In the case *sub judice,* Petitioner has argued in his

brief that "[t]he failure to raise any and all of the State's *Brady* violations on direct appeal constituted deficient performance on the part of appellate counsel." He further states: "That appellate counsel only raised two very weak issues on direct appeal would be understandable had there been no more effective issues to raise." He notes that there were "five independent pieces of evidence that demonstrated constitutional-level error on behalf of the State for neglecting to provide these items to Appellant and his defense team prior to trial." We have carefully reviewed the arguments set forth in Petitioner's brief, mindful of the requirement in *Carpenter* that we must determine whether the omitted issues had merit. We are not persuaded that the omitted issues had any merit. Accordingly, Petitioner is not entitled to relief on this issue.

In conclusion, we reverse the judgment of the trial court denying post-conviction relief and vacate Petitioner's conviction for attempted second degree murder and employing a handgun during the commission of a dangerous felony. The cause is remanded for a new trial.

_____
THOMAS T. WOODALL, JUDGE